[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1284 
The defendant, Jefferson County, appeals from a judgment on a jury verdict entered for Southern Natural Gas Company ("Sonat"), in an action for damages brought pursuant to § 235 of the Constitution of Alabama of 1901 for a taking of, injury to, or destruction of Sonat's property for public use and for damages for tortious conduct. We affirm.
This case is fact-specific.
In 1929, Tennessee Coal, Iron Railroad Company (hereinafter referred to as United States Steel Corporation), deeded to Sonat an easement (which was later amended in 1931), granting Sonat the right to construct, operate, maintain, and remove a pipeline. In the agreement, U.S. Steel reserved the right to grant easements to others, but expressly stated that such grants of future easements could not unreasonably interfere with Sonat's pipelines. The agreement also provided that Sonat's rights would be superior to any such rights U.S. Steel might grant to others in the future and that the character of the use of other easements "shall be in accordance with the reasonable requirements" of Sonat.
Around 1930, pursuant to the agreement with U.S. Steel, Sonat installed a pipeline. In 1961 and in 1968, Sonat obtained two additional easements from U.S. Steel to install an additional pipeline parallel to the first pipeline. According to Sonat, the two pipelines cross under Valley Creek east and upstream from where the creek flows under the Powder Plant Road bridge in Bessemer, Alabama; the pipelines were in somewhat of a "U" shape to follow the shape of the then-existing creek banks and creek bottom; and running along the north side of Valley Creek is a county road.
Sonat maintains and protects its pipelines by conducting two types of surveillance (a weekly aerial patrol and an annual foot patrol); this surveillance alerts Sonat to any problems or potential problems with the pipelines. In the early 1980's, Sonat surveillance teams noticed that some of the three-foot soil cover over part of one of the pipelines crossing under Valley Creek had begun to "scour." By 1984, approximately 20 feet of the top of the scoured pipeline could be seen in the bottom of the creek and a two- to three-foot section of that same pipeline had become scoured all the way around, so that for a short distance, water could actually pass under the pipe. However, the other 17 to 18 feet of the exposed pipeline was still securely supported by the creek bank and the creek bed. Because the pipeline was still supported by the creek bank and the creek bed, Sonat determined that it need not make repairs or adjustments to the scoured pipeline at that time. However, according to Sonat, had the scouring continued, allowing much longer lengths than the two- to *Page 1285 
three-foot sections to be suspended without any soil support, a hazard would have resulted, and Sonat then would have remedied the problem by a relatively inexpensive repair of the creek bank that entailed covering the exposed pipeline with "riprap" or other suitable material.
In 1973, the County acquired from U.S. Steel a right-of-way for drainage in Valley Creek, "subject to such easements as may exist over, across or upon said right-of-way for pipelines, transmission lines. . . ." In July 1984, a County employee telephoned Sonat, informing Sonat that because of a flooding problem during periods of heavy rain, the County was planning to enlarge Valley Creek and add spans to Powder Plant Road bridge. The County confirmed the telephone call by letter dated July 9, 1984, advising Sonat that the County would begin the project in August. Enclosed with the letter were plans reflecting the County's proposal to widen Valley Creek to 150 feet.
Because the engineering lines of the new creek channel on the County's plan went directly through the area of Sonat's pipelines, Sonat concluded that the County's plan would take part of Sonat's right-of-way. Consequently, Sonat notified the County in writing that Sonat would have to conduct a field inspection and survey of the location "in order to determine any adjustments to the pipelines which might be required." Sonat also requested that the County not begin the project until Sonat had completed the study.
Thereafter, the County drawings were given to Sonat's engineering department. A Sonat surveyor and the head of Sonat's division over the two pipelines met with a County employee at the location of the pipelines to get a "general feel for the site." Although the head of Sonat's division over the pipelines noted the scouring of the pipeline, including the two- to three-foot open area under the pipe, he nonetheless concluded that, at that time, the scouring posed no hazard.
In late August or early September 1984, upon Sonat's completing its study of the County's proposed widening of the creek in the area of the pipelines, Sonat concluded that 80 to 90 feet of one of the pipelines and approximately 30 to 40 feet of the other pipeline would be exposed and unsupported in the air by the County's proposed project. Thus, according to Sonat, in order to accommodate the County's project and to avoid damage to the two pipelines, Sonat concluded that it would have to relocate and adjust the pipelines, at an estimated cost of $187,700. In September 1984, Sonat presented to the County engineering drawings showing the effect of the County's project on the pipelines and explaining how the pipelines would have to be relocated and adjusted to accommodate the new channel the County proposed to excavate. Sonat also informed the County of the estimated cost of the relocation and adjustments and explained that Sonat expected the County to pay for the relocation and adjustments.
The County told Sonat that the County would not pay for any pipeline relocation or adjustment; and, according to Sonat, the County told Sonat that it would simply dig the new channel up to one side of Sonat's right-of-way and begin again on the other side, thus leaving the pipelines as a "plug" in the middle of the new creek channel and "let nature take its course." Subsequently, the County began the project.
By early October 1984, aerial photographs indicated that the excavation had left Sonat's easement as a "plug" or "finger" jutting out into the new creek channel and had diverted the creek water onto a part of Sonat's pipeline not impacted by the old creek channel. Another photograph revealed that the County's heavy equipment had crossed over Sonat's pipelines in the creek bed. When the head of the division over the two pipelines saw these photographs, he became concerned over the impact of the County's project on the easement and the pipelines. He testified that this "plug" of the old creek bank would simply wash away and leave the pipelines suspended in the air, subject to buckling; that this situation constituted an unacceptable risk to Sonat and to the public; that he recommended that Sonat relocate the *Page 1286 
two pipelines in spite of the fact that the County refused payment; and that but for the County's project, Sonat would not have had to relocate the pipelines. He also testified that with respect to the preexisting scoured pipeline, if that pipeline had become more scoured in the creek bank in the future to the extent that it had become a hazard, the most Sonat would have had to do would have been to add "riprap" and other creek bank repair material, at a cost of no more than $10,000 to $15,000.
Although there was some uncertainty as to when the "plug" would wash away, according to the evidence presented by Sonat it would wash away and could do so "at any time"; therefore, Sonat said it could not take the risk that it would occur in the first year. Furthermore, Sonat's testimony and its brief on appeal indicated that it believed that it had no choice but to go ahead and relocate the pipelines to prevent the "plug" from washing away and thereby to prevent the pipeline from buckling and rupturing and causing harm to the public and disrupting the supply of natural gas to the public.
Sonat received bids for the relocation work, which consisted of removing the two existing pipelines, redigging new trenches, and putting in new pipelines to replace the old ones. The lowest bid was accepted; the project took over one month to complete and cost $186,121.22.
After relocating and adjusting the pipelines, Sonat requested that the County reimburse Sonat for the cost. It refused to do so.
Consequently, Sonat sued the County, alleging that "the improvement by [the County], including the necessary relocation of [Sonat's] pipeline, was a taking, injury or destruction of [Sonat's] property for public use within the meaning of § 235 of the Alabama Constitution of 1901 entitling [Sonat] to compensation [of $186,121.22]" and alleging that the "actions of [the County] were tortious and caused [Sonat] to suffer consequential damages in the amount of $186,121.22." The County moved for a summary judgment, which the trial court denied.
At the outset of the trial, the court granted Sonat's motion in limine to restrict the County's presentation of evidence as to the County's experience in dealing with other utility companies, which the County said had voluntarily relocated their utilities in connection with the Valley Creek project at no cost to the County. At the close of Sonat's evidence and again at the close of all the evidence, the County moved for a directed verdict, which the trial court denied.
The jury returned a verdict for Sonat in the amount of $190,303.80. The trial court entered a judgment on the jury's verdict. Thereafter, the County moved for a judgment notwithstanding the verdict and moved for a new trial or, in the alternative, for remittitur; the motions were denied. The County appeals.
The County maintains that the trial court erred in allowing the jury to determine whether Sonat's property had been taken, injured, or destroyed pursuant to § 235, because, it says, pursuant to Ala. Code 1975, § 18-1A-150(b), the issue of the right to condemn in eminent domain cases is a question for the trial court and only the amount of compensation is to be determined by the jury.
Although in formal condemnation cases brought by the condemning authority, the issue whether the authority had the right to condemn is determined by the trial court, with the jury deciding compensation only, in inverse condemnation proceedings, such as this case, the jury decides not only the question of the amount of compensation but also whether there was a § 235 "injury." See, Town Campus Apartments, Inc. v.Kemp, 548 So.2d 436 (Ala. 1989).
Section 235 specifically requires municipalities and other corporations "invested with the privilege of taking property for public use" to make "just compensation" for "property taken, injured, or destroyed by the construction or enlargement of its works, highways, or improvements," where there is evidence of some direct physical *Page 1287 
injury to the property. See, Alabama Power Co. v. City ofGuntersville, 235 Ala. 136, 177 So. 332 (1937).
In United States v. Clarke, 445 U.S. 253, 100 S.Ct. 1127,63 L.Ed.2d 373 (1980), the United States Supreme Court explained the difference between formal condemnation proceedings and inverse condemnation proceedings. A formal condemnation proceeding is a legal action brought by a condemning authority, such as the Government, in the exercise of its power of eminent domain. "Inverse condemnation" refers to a legal action against a governmental authority to recover the value of property that has been taken by that governmental authority without exercising its power of eminent domain — it is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when the taking authority has not initiated condemnation proceedings. Condemnation proceedings require affirmative "taking" action on the part of the condemning authority; the particular action required depends on the particular statute applicable. However, in inverse condemnation actions, a governmental authority need only occupy or injure the property in question; when that occurs and the property owner discovers the encroachment, the property owner has the burden of taking affirmative action to recover just compensation.
This case involves inverse condemnation; therefore, the trial court did not err in allowing the jury to determine whether there had been a § 235 "taking" or "injury."
The County maintains that "[t]he Valley Creek anti-flooding project as performed by the County at no time resulted in a 'taking, injury, or destruction' of [Sonat's] property[;] . . . it did not interfere in any way whatsoever with Sonat's property rights or easement[;] . . . [and it] did not result in an 'injury' to [Sonat's] property as contemplated in § 235."
From a review of the record, we conclude that the evidence established that the County's widening of Valley Creek to alleviate flooding resulted in the diversion of water onto Sonat's pipelines and thereby transformed a large segment of the pipelines into a "plug" in a new creek channel and that this "construction or enlargement" of the County's works or improvements along Valley Creek resulted in a direct physical "injury" to Sonat's pipelines.
The County also argues that its anti-flooding project was a valid exercise of its police powers and, therefore, that Sonat can have no recovery pursuant to § 235. We find that argument without merit.
Whereas the exercise of a valid police power is an exception to the requirement that an authority compensate one whose property has been injured, in exercising its police power an authority cannot disregard constitutional inhibitions, such as that found in § 235. See, e.g., Panhandle Eastern Pipe Line Co.v. State Highway Comm'n of Kansas, 294 U.S. 613, 622,55 S.Ct. 563, 567, 79 L.Ed. 1090 (1935) ("The police power of a state, while not susceptible of definition with circumstantial precision, must be exercised within a limited ambit and is subordinate to constitutional limitations."). Before the provisions now found in § 235 were incorporated into the Constitution, an authority could act and would not be held responsible for any consequential damages if no actual "taking" occurred. However, construing a predecessor of § 235, this Court held that it was intended to remedy this hardship caused to the individual property owner, by "requir[ing] the public to bear the burden of municipal improvements . . . made for the public benefit, and not to crush the private citizen by imposing upon him alone the entire damage which may have been caused to his property." City Council of Montgomery v. Maddox,89 Ala. 181, 189, 7 So. 433, 436 (1890).
Although there is no Alabama case directly on point, we note that there is a distinction between the "taking" of or "injury" to property pursuant to police powers and a "taking" of or "injury" to property that is compensable under § 235. *Page 1288 
For example, when the property taken is itself a nuisance, so that the authority must act, then that taking would be within the exercise of the police power and would not be compensable if it was not achieved in an arbitrary or corrupt manner and did not amount to an abuse of the police power. See, e.g.,City of Mobile v. McClure, 221 Ala. 51, 127 So. 832 (1930);City of Birmingham v. Graves, 200 Ala. 463, 76 So. 395 (1917). However, if the authority is enlarging or improving something, e.g., a highway or a creek, and in achieving that enlargement or improvement it must "take" or "injure" property that is not itself a nuisance or is not the reason for the project, then that "taking" of or "injury" to the property would be constitutionally compensable. See City Council of Montgomery, supra; see, also, McEachin v. Mayor of City of Tuscaloosa,164 Ala. 263, 51 So. 153 (1909); Town of Avondale v. McFarland,101 Ala. 381, 13 So. 504 (1893); Panhandle Eastern Pipe Line Co., supra.
In this case, although the County initiated its project for the general welfare of the public — to alleviate flooding throughout the Valley Creek area — there was no evidence that Sonat's pipelines were a nuisance or were the reason for the project. Therefore, the County's action in taking or injuring the pipelines was not a valid exercise of its police power.
The County also argues that if the Court determines that its actions injured Sonat's easement and pipelines, the injury is not compensable because, it argues, the proof of damages was speculative.
The evidence established that the cost of relocating the pipelines was known at the time of the County's project. Thus, it seems that what the County is arguing is the speculative nature of relocating the pipelines. Suffice it to say, without further discussion, that there was sufficient evidence in the record for the jury to conclude that the "plug" created by the County's widening of Valley Creek would wash away and leave the pipelines suspended in the air, subject to buckling and rupturing, so that if Sonat had not relocated them there would have been a risk of explosion and harm to human health and the environment. Furthermore, there was sufficient evidence that the injury to Sonat's pipelines, which was the proximate result of the County's widening of Valley Creek, was clearly ascertainable at the time of construction. See, e.g.,Hamilton v. Alabama Power Co., 195 Ala. 438, 70 So. 737 (1915). Therefore, the damages (based on the evidence that the pipelines were at risk and the evidence of the cost of relocating them) were ascertainable, not speculative, when the County undertook the widening project.
The County also argues that the trial court erred in granting Sonat's motion in limine to preclude the County's introducing evidence that "all other utilities voluntarily relocated their lines without charge to the County." It is well settled that the trial court has broad discretion in granting a motion in limine, see Bush v. Alabama Farm Bureau Mutual CasualtyInsurance Co., 576 So.2d 175 (Ala. 1991), and that its decision will not be reversed absent a clear abuse of discretion, seeWorks v. Allstate Indemnity Co., 594 So.2d 60 (Ala. 1992). Considering the facts of this case, the nature of the motion in limine — that is, that it was directed to evidence as to what other utilities may have done in Valley Creek — and the broad discretion accorded the trial court in granting motions in limine, we hold that the trial court did not err in granting Sonat's motion in limine.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES and KENNEDY, JJ., concur. *Page 1289