**HOUSING INVESTORS, INC., et al., Plaintiffs,**

v.

**CITY OF CLANTON, ALABAMA, et al., Defendants.**

**No. CIV. A. 98–T–54–N.**

United States District Court, M.D. Alabama, Northern Division.

Oct. 14, 1999.

Douglas P. Corretti, Mary Douglas Hawkins, Donna R. Shirley, Corretti, Newsom & Hawkins, Birmingham, AL, for Plaintiffs.

James W. Porter, II, Kathryn L. Harman, Porter, Porter & Hassinger, Carrie D. Thornburgh, Garrison & Sumrall, PC, Birmingham, AL, for Defendants.

James P. Pewitt, Johnston, Barton, Proctor & Powell, John M. Fraley, David T. White, III, Lusk, Fraley, McAlister & Simms, PC, Birmingham, AL, for Clanton Country Club, Inc.

Mark S. Boardman, P. Camille Lamar, Boardman, Carr & Weed, PC, Birmingham, AL, for Chilton County Bd. of Educ.

## ORDER

MYRON H. THOMPSON, District Judge.

This lawsuit arises out of a 1997 decision by the Clanton City Council to prohibit the development of a proposed housing complex for tenants of low-to-moderate income in the City of Clanton, Alabama. The plaintiffs are Housing Investors, Inc., the would-be developer of the proposed project, and Robert Binion, an African–American who claims to be a potential resident of the disputed housing. The defendants are the City of Clanton, the Clanton Country Club, the Chilton County Board of Education, and various city officials sued in the official capacities.

The plaintiffs claim that the decision to reject the development violated their rights secured by the following sources of federal law: the Fair Housing Act of 1968, as amended, 42 U.S.C.A. §§ 3601–3619, 3631, commonly referred to as the FHA; 42 U.S.C.A. §§ 1981 and 1982, enforced by 42 U.S.C.A. § 1983; 42 U.S.C.A. § 1985(3); the equal protection clause and the due process clause of the fourteenth amendment to the United States Constitution, as enforced by § 1983; and the takings clause of the fifth amendment to the United States Constitution, as enforced by § 1983. The plaintiffs also assert violations of their rights established by the following sources of Alabama law: the common law doctrines of equitable estoppel and vested rights; and substantive due process as provided by the Alabama Constitution and statutes. The plaintiffs also seek a declaratory judgment on the status of Country Club Road in the City of Clanton. Jurisdiction in this court is based on 28 U.S.C.A. §§ 1331 (general federal question), 1343 (civil rights), and 1367 (supplemental) and on 42 U.S.C.A. § 3613(a)(1)(A)(FHA).

This lawsuit is now before the court on motions for summary judgment filed by all defendants. As will be explained below, some of the plaintiffs' claims will be dismissed with prejudice, some will be dismissed without prejudice, and some will not be dismissed at all at this time.

## I. BACKGROUND

In making its determination on summary judgment, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Accordingly, the facts, as gathered from the affidavits, deposition testimony, and other evidence submitted by the parties but viewed in the plaintiffs' favor, are as follows.

Housing Investors is an Alabama corporation based in Decatur, Alabama, that develops and manages real estate, in particular multi-family housing for low-to-moderate income families. In September 1996, Housing Investors bought an option on five acres of land owned by Herbert Dennis in the City of Clanton for the purpose of developing a housing complex for tenants of moderate income. The land is located next to the Clanton Country Club on Country Club Road and behind the football field of Clanton City High School, and it is within walking distance of a business district with discount stores, fast-food restaurants, and other light service businesses. The option contract was made contingent upon successfully rezoning the land from its original AG designation, restricted to agricultural uses, to the R–3 designation for multi-family residential use.

The owner applied with the City Planning Commission for the necessary rezoning. At a public hearing on the application, the Planning Commission voted unanimously to recommend approval. In January 1997, after another public hearing, the City Council unanimously adopted an ordinance rezoning the land as requested.

Objections to Housing Investors' development surfaced that summer. In July 1997, a Housing Investors official met with

city officials to review the development plans and, in the course of that meeting, was asked to confirm that 'section 8 rent vouchers' would be permitted in the new apartment complex. Section 8 is a federal housing subsidy program which ensures that low-income tenants pay no more than one third of their income toward rent by paying the rent-income differential directly to the tenant's landlord. After that meeting, Clanton Mayor Billy Joe Driver called Housing Investors and cautioned that some citizens, notably the Clanton Country Club, were concerned about section 8 residents moving to that site and would likely petition for reconsideration of the rezoning decision.

The following month, the Clanton Country Club and other residents requested hearings to voice their opposition. The request was granted. At the request of representatives of the Country Club and amid charges that Clanton had been misled by Housing Investors about the exact nature of the development plans, the Planning Commission voted on August 14 to recommend an investigation. The Planning Commission convened an informational meeting on August 21 and a public hearing on September 4.

Attendees of these meetings raised a number of concerns. School officials expressed fears that youth in the complex would vandalize the school property and noted that the income limits for the complex would bar the high school's teachers from living there. Some were troubled by the prospect of increased traffic at the intersection of Country Club Road and U.S. Highway 31. David Puckett, a member of the Club, asked "what kind" of people would be living in the complex. That "kind" of people was described at least once by an attendee as "low class."

At the September 4 meeting of the Planning Commission, Mayor Driver and Commissioner Douglas Scott reported on their visit to Housing Investors' complex in Columbiana, Alabama; although a Housing Investors employee states that these Planning Commission visitors had asked pointedly during the visit how many blacks, Mexicans, children, and divorced women lived in the complex, Driver and Scott had nothing to say at this meeting about the composition of the residents and in fact reported positively that the Columbiana complex was clean and well-maintained, did not have any "run-down vehicles" on the front lawn, and had no record of safety problems with the police. The Planning Commission concluded this meeting without considering any rescission of the rezoning decision. Four days later, the City Council voted to issue Housing Investors its building permit.

Later that month, the city discovered that the rezoning ordinance was technically defective and invalid. The city clerk had failed to include certain language required by the Alabama Zoning Enabling Act when the proposed ordinance was published. Housing Investors decided to reapply, but with a proposal that increased the number of units from 40 to 56. At yet another hearing before the Planning Commission, members of the Country Club and others again opposed the development.

A new issue emerged: whether the proposed complex would have access to a public road. The Dennis parcel was presumed to be located on Country Club Road when the first rezoning decision was made. Country Club Road would be the means of ingress and egress for residents of the apartment complex. The Clanton Country Club now claimed that Country Club Road was a private drive owned by the Club and not a public road. Further, the Club claimed to own land on both sides of Country Club Road, meaning that the Dennis parcel was land-locked, lacking access to any public road. Housing Investors first learned of the possibly private ownership of the road when surveyor Steven Gay noted that, although the road appeared to be public, it possibly was subject to a claim of title and was thus labeled on his map as "prescriptive" rather than undisputedly public. Still, what looked like a public road to Gay apparently looked like a public

road to everyone else, because no discussion of the purportedly private ownership of the road was raised in any of the public hearings until the October 16 Planning Commission hearing when the Club presented its survey of its property. As Gay explained in an informal sketch to the Commission, the Club had title not just to the road itself but also to a strip of land on the other side of the road, making the Dennis parcel not contiguous with the road but set back from it.

Housing Investors maintained that the Country Club Road issue was bogus: that the road had been used publicly for up to 35 years, that it had been, and was still being, maintained by city and county governments, and that the strip that runs along side the road is a foot or less in width and is really just part of the road (that is, the roadside or shoulder parts of all roads that are necessary for an adequate road).

The Planning Commission voted unanimously on October 16 to deny the rezoning, citing problems of access to Country Club Road, congestion on U.S. Highway 31, and the availability of other parcels in Clanton for the proposed project. The City Council, after holding its own public hearing in November 1997, unanimously denied the reapplication. Housing Investors and Robert Binion, an African–American Clanton resident who attended some of the public hearings, then filed suit against the City of Clanton; individually named members of the Planning Commission in their official capacity; individually named members of the City Council in their official capacity; Mark A. Thornton, Building Official and Zoning Administrator of the City of Clanton, in his official capacity; Billy Joe Driver, Mayor and member of the Planning Commission and the City Council, in his official capacity; the Clanton Country Club; and the Chilton County Board of Education.

## II. DISCUSSION

Summary judgment can be granted only if, after viewing evidence and inferences in the nonmovant's favor, the court finds that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate that summary judgment is inappropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This shifting of the burdens of production and proof is governed by the substantive law of the dispute. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the movant and nonmovant's respective burdens vary whether the legal issues, to which the facts in question pertain, are ones for which the movant or nonmovant bears the burden of proof at trial).

### A. Threshold Issues

The defendants argue that the plaintiffs lack standing, that some of their theories are not ripe disputes, and that some of the defendants are absolutely or qualifiedly immune from suit in the first instance. If true, these problems of standing, ripeness, and immunity present constitutional, prudential, and policy-based limitations on the power of this court to proceed further. To avoid offering a merely advisory opinion, the court will address these concerns first.

*Standing:* Standing doctrine has developed from both constitutional mandate and prudential restraint. The constitutional requirements for standing are that the plaintiff claims an injury in fact, alleging concrete, particularized harm that is either actual or imminent; that the injury is causally linked, or fairly traceable, to the defendant; and that the injury can likely be redressed by the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). These requirements are complemented by the prudential prohibitions against vicarious representation, generalized grievances, and claimants outside the contemplated zone of interests of the right

of action. *See Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Claims under the FHA are not subject to the prudential standing rules, *see generally Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), but all of the other claims are subject to both sets of standing rules.

■ Under neither set of rules does plaintiff Robert Binion have standing to sue. He has nothing but the most abstract interest in the proposed housing development; in deposition, he admitted that he would not consider moving from the house he owns to rent an apartment in the development unless a natural disaster destroyed his home. Even with every reasonable inference granted to the plaintiffs, Binion has not suffered a concrete injury under any set of facts alleged. The FHA permits standing based on injury that is more abstract in character; still, after dozens of briefs, the plaintiffs' best effort has been to argue that Binion was injured because the zoning decision "deprived him of an opportunity to make application to lease an apartment within the complex." An opportunity he does not want and would not likely seek to enjoy is not an opportunity of which he has been deprived. Although this theory is surrounded in plaintiffs' various briefs by summaries of FHA standing jurisprudence, those summaries are random and disconnected, and they provide nothing to support this claim to a basis for standing. Pastiche does not suffice as legal argument. Lacking standing, Binion will be dismissed as a plaintiff from this suit.

■ Housing Investors does, however, have standing. Housing Investors has proffered facts from which a reasonable jury could conclude that it suffered an actual concrete injury in the unfavorable zoning decision. Like the plaintiff in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), Housing Investors has expended funds on the plans for the proposed Country Club Road complex and on various studies submitted to the Planning Commission and the City Council to support its request for rezoning, and its grievance is not simply abstract but instead grounded in the specific project it intends to build. Housing Investors has standing, and, for the rest of this order, Housing Investors will be considered the sole plaintiff.

■ *Ripeness:* The city defendants argue that three of Housing Investors' claims are not yet ripe for adjudication. First, they take issue with the claim for just compensation under the fifth amendment to the United States Constitution.[1] The complaint alleges that the City Council's refusal to rezone deprives Housing Investors of all economically viable, beneficial, and productive use of its property without just compensation "if just compensation is not available under state law."[2] Housing Investors does not allege that just compensation is not, in fact, available under state law or that they have sought unsuccessfully to obtain it.[3] The claim for just compensation under the fifth amendment is therefore not ripe for adjudication at this time and must be dismissed. *See Williamson County v. Hamilton Bank*, 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985) ("[A] property owner has not suffered a violation of the just compensation clause until the owner has unsuccessfully attempted to obtain just compensation ...."); *see also Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1542 (11th Cir.1991); *Eide v. Sarasota County*, 908 F.2d 716, 720 (11th Cir.1990).

1. The fifth amendment of the United States Constitution provides, in relevant part, "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

2. Complaint, filed January 21, 1998, ¶ 69.

3. Alabama law gives property owners the right to seek compensation in an inverse condemnation proceeding. *See Jefferson County v. Southern Natural Gas Co.*, 621 So.2d 1282 (Ala.1993); *Ex parte Carter*, 395 So.2d 65, 67 (Ala.1980).

■ The defendants similarly contend that the due-process claim of arbitrariness and caprice is not ripe for adjudication. The only ripeness requirement for a claim of arbitrariness and caprice in zoning decisions is that "the particular zoning decision being challenged ... be finally applied to the property at issue." *Eide,* 908 F.2d at 725; *see also id.* at 725 n. 16 ("Thus, in an as applied arbitrary and capricious due process claim challenging a zoning decision denying commercial zoning, the landowner need only obtain a final decision denying commercial zoning."). Housing Investors has obtained a final decision: It applied for rezoning, and that application was rejected. The City Council's decision was final, and Housing Investors' due-process claim of arbitrary and capricious decision-making is therefore ripe for adjudication.

■ Finally, the defendants contend that the equal-protection claim is not ripe. They argue that the applicable ripeness standard for an equal-protection claim is the same as that required for a due process claim of arbitrariness and caprice—namely, that Housing Investors must obtain a final decision before proceeding. A final decision is indeed required before a plaintiff may assert a claim that a zoning decision has no constitutionally permissible basis and thus violates the equal-protection clause of the fourteenth amendment. *See Executive 100,* 922 F.2d at 1542; *Eide,* 908 F.2d at 724 n. 12, 725 n. 16. Although Housing Investors would easily satisfy the defendants' preferred standard, a final decision is not required where, as here, a plaintiff asserts an equal protection challenge to a decision allegedly motivated by racial considerations. Such a decision is final and reviewable when made. *See Landmark Land Co. of Oklahoma, Inc. v. Buchanan,* 874 F.2d 717, 723 n. 3 (10th Cir.1989). Housing Investors' equal-protection claim is therefore ripe for adjudication.

*Immunity from Suit:* Among the defendants are various members of the Planning Commission, sued in their official capacities, and various individual members of the Clanton City Council, likewise sued in their official capacities. Other government defendants include Mark Thornton, the city's building and zoning official, and the City of Clanton itself. The defendants urge that they are absolutely immune as legislators and, further, that they are all qualifiedly immune.

■ Local legislators are entitled to absolute immunity from suit under 42 U.S.C.A. § 1983 for "all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott–Harris,* 523 U.S. 44, ——, 118 S.Ct. 966, 972, 140 L.Ed.2d 79 (1998) (quoting *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951)). This immunity is broad-sweeping and protects its bearer from liability for damages as well as for declaratory and injunctive relief. *See Supreme Court of Va. v. Consumers Union,* 446 U.S. 719, 731–32, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980); *but see Executive 100, Inc. v. Martin County,* 922 F.2d 1536, 1539 (11th Cir.1991) (suggesting in dictum that a defendant who enjoys official immunity from suits for damages may be subject to suits for prospective injunctive relief). Legislative immunity is accorded not merely to legislators per se but to those government officials who are sued for performing legislative functions. *See Bogan,* 523 U.S. at ——, 118 S.Ct. at 973; *Woods v. Gamel,* 132 F.3d 1417, 1419 (11th Cir. 1998). Acts such as voting, *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1880), debate, *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), and participating in committee investigations and proceedings, *Tenney,* 341 U.S. at 377–79, 71 S.Ct. at 788–89, have in the past been deemed legislative and therefore protected by the doctrine of legislative immunity. *See Yeldell v. Cooper Green Hospital, Inc.,* 956 F.2d 1056, 1062 (11th Cir.1992) (cataloging acts protected and unprotected by legislative immunity). More generally, an act is legislative, rather than administrative or managerial, when it

establishes official policy and is of general application. *Woods*, 132 F.3d at 1417.

■ Voting on land-use regulation clearly establishes policy, applies generally, and constitutes a legitimate legislative activity. *See Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir.1989). Members of the City Council and Planning Commission are therefore entitled to legislative immunity for their votes to reject the proposed housing project, and they will be dismissed from this lawsuit.

■ The court is further inclined to dismiss both the mayor, Billy Joe Driver, and the building official and zoning administrator, Mark A. Thornton, because there is no allegation that they did anything other than participate in the deliberative process surrounding Housing Investors' rezoning application. But the court cannot conclude beyond doubt that Driver and Thornton are entitled to legislative immunity, though, because it is not altogether clear what role they played in this whole process, and because they are executive officials who can be sued for injunctive relief to prevent executive action on legislation that violates civil rights. Nonetheless, the court need not resolve this issue because Driver and Thornton are unnecessary defendants in their official capacities. To the extent Housing Investors has sued Driver and Thornton in their official capacities Housing Investors has essentially sued the City of Clanton. *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (Official-capacity lawsuits are, "in all respects other than name, . . . treated as a suit against the entity."). And to be sure, a plaintiff may sue a defendant in his official capacity, if such suit is not otherwise barred. But suing a defendant in such capacity is usually necessary only when a suit against the governmental entity itself is barred by the eleventh amendment to the United States Constitution. In such instances, a suit against governmental officeholders in their official capacities is the only effective way to bring the governmental entity into court and obtain relief. *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that there is an exception to eleventh amendment immunity for actions seeking declaratory and injunctive relief against state officials for alleged violations of federal law). Here, however, there are no eleventh-amendment immunity issues presented. Therefore, there is no need to maintain suit against Driver and Thornton in their official capacities. Indeed, the other individual defendants are due to be dismissed in their official capacities for this alternative reason.

■ The City of Clanton itself is not entitled to any legislative immunity. "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978) (footnote omitted). The city will therefore remain as a defendant, but, notably, the city is immune from claims for punitive damages. *See City of Newport v. Fact Concerts*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

■ The claims of qualified immunity are, however, unavailing for all defendants. Qualified immunity protects government actors from personal liability for official acts. *See Kentucky v. Graham*, 473 U.S. at 165, 105 S.Ct. at 3105. The complaint is very clear, however, that Housing Investors is not suing the city's officials in their personal capacities. The city officials are therefore not subject to personal liability, and the issue of qualified immunity is irrelevant.

### B. Conspiracy

■ Housing Investors claims that the Clanton Country Club, the Chilton County Board of Education, and the city defendants conspired to violate its civil rights, in

violation of 42 U.S.C.A. § 1985(3).[4] In response, the Country Club raises the defense of the petition clause of the first amendment to the United States constitution, and the Board of Education claims an intracorporate conspiracy doctrine as a defense. There is no need for this court to address these complex and novel defenses because Housing Investors has not met its burden of developing an evidentiary record to support any conspiracy claim in the first instance. It is classic hornbook law that the first element of any conspiracy claim is an agreement, some meeting of the minds, focused on an impermissible purpose. Even with every reasonable inference granted Housing Investors, it has failed to show any evidence from which a conspiratorial agreement can be attributed to the defendants. Accordingly, Housing Investors' § 1985(3) conspiracy claim will be dismissed.

### C. Racial Discrimination in Housing

Housing Investors raises a claim simultaneously under the FHA, the equal protection clause of the fourteenth amendment, and §§ 1981 and 1982 as enforced through § 1983, that it was injured by the adverse rezoning decision because of racially discriminatory motives. Housing Investors also raises a related theory that the Country Club and the Board of Education violated the FHA by coercion, threat, intimidation, or interference with the Housing Investors' rights under the FHA.

*Discriminatory Zoning Decision:* Housing Investors has two options to state its claim under the FHA, which states that it is "unlawful ... [t]o make unavailable or deny, a dwelling to any person because of race," 42 U.S.C.A. § 3604(a): to show discriminatory motive in the zoning decision, or to show alternatively that the denial of rezoning has a racially disparate impact. *See Jackson v. Okaloosa County,* 21 F.3d 1531, 1543 (11th Cir.1994) ("We have held that the Fair Housing Act prohibits 'not only direct discrimination but practices with racially discouraging effects ...'; thus, a showing of a significant discriminatory effect suffices to demonstrate a violation of the Fair Housing Act.") (quoting *United States v. Mitchell,* 580 F.2d 789, 791 (5th Cir.1978)).[5]

Housing Investors' equal protection claim cannot rely simply on disparate impact but must instead prove "that a discriminatory purpose has been a motivating factor in the decision." *Arlington Heights,* 429 U.S. at 265–66, 97 S.Ct. at 563. Discriminatory intent is likewise required to show that racially-motivated zoning violates 42 U.S.C.A. § 1981[6] and 42

---

4. Section 1985(3) provides:

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

5. In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

6. Section 1981 provides:

"Equal rights under the law

U.S.C.A. § 1982.[7] *See General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (holding that the Civil Rights Act of 1866 and its modern successor, § 1981, require proof of discriminatory motive and not merely disparate effect); *Buchanan v. Warley,* 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917) (applying §§ 1981 and 1982 to zoning); *Save Our Cemeteries, Inc. v. Archdiocese of New Orleans, Inc.,* 568 F.2d 1074 (5th Cir.1978) (holding that §§ 1981 and 1982 require evidence of racially discriminatory animus). *Accord see* 1 Rodney A. Smolla, Federal Civil Rights Acts § 13.03[5], at 13–21 n.38 (3d ed. 1999) ("Because §§ 1981 and 1982 tend to be interpreted in a parallel fashion, most lower courts have read *General Building Contractors* as authority for the proposition that § 1982 claims also require proof of discriminatory intent.").

■ To claim an FHA violation through significant discriminatory effect, a plaintiff challenging a zoning decision can show either that the decision has a segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside that group. *See, e.g., Jackson,* 21 F.3d at 1543 (finding plaintiff had stated claim for significant discriminatory effect in decision to exclude public housing by showing "a harsher impact on African–Americans than whites" because blacks constituted 86% of the waiting list for public housing); *Mitchell,* 580 F.2d at 791 ("The fact that a large majority of

Mitchell's black tenants were clustered in a defined area is highly probative of [an FHA] violation.... 'Conduct that has the necessary and foreseeable consequence of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating the [open housing policy].'") (quoting *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977)). *See also* Frederic S. Schwartz, *The Fair Housing Act and "Discriminatory Effect": A New Perspective,* 11 Nova L.Rev. 71, 72 text accompanying notes 4–6 (1986).

Housing Investors appears to have veered in both of these directions but never quite arrived at either one. To argue that the City of Clanton is a segregated enclave within Chilton County, Housing Investors produces the following: that the ratio of detached single-family dwellings to multi-family dwellings in Chilton County is 2.5 to 1, compared to 6.14 to 1 in the City of Clanton; that there is a disparity between the median monthly rent in Chilton County and that in the City of Clanton (the former, presumably, being significantly lower than the latter); and that the City of Clanton is 80.5% white and 19.5% non-white. To argue that the rezoning denial has had a significantly more restrictive effect for blacks, Housing Investors compares the per capita income for blacks and whites in Chilton County (the former, $5,959; the latter, $10,307) and observes that blacks in Clanton are twice as likely as whites to be low-income. Without any

(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment

of all benefits, privileges, terms, and conditions of the contractual relationship.
(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

7. Section 1982 provides:

"Property rights of citizens: All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

further synthesis, analysis, or supplementing evidence, Housing Investors concludes that a finding of disparate impact is clearly inevitable.

It is not. To make a case for segregative effect, the plaintiff must have a more thoroughly developed record that shows such indicia of segregation as localized concentrations of minority groups within the municipality; comparisons of the racial composition of the areas inside and outside the municipality, showing that minority groups have been excluded from the municipality; and historical practices of segregation, the effects of which linger in the present. *See, e.g., Huntington v. Huntington Branch NAACP*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). Housing Investors has not made such a case. The significant disparity between the ratios of single-family detached dwellings and multi-family dwellings could mean that affordable housing is largely excluded from the City of Clanton—or it could mean nothing, if, for example, trailers are counted along with mansions in the number of detached single-family dwellings and very large apartment complexes and smaller-scale townhouses and duplexes are all counted equally in the number of multi-family dwellings. Likewise, the statistic that the population of the City of Clanton is 80.5% white and 19.5% nonwhite only repeats the otherwise unsurprising fact that racial minorities are minorities. Without more, this observation does little to support the claim of a segregative effect.

■ Housing Investors' comparison of the hardships resulting from the rezoning denial is similarly lacking. A plaintiff arguing that a zoning decision has a racially disparate adverse effect must look at the group that has actually suffered the adverse effect. The court in *Jackson*, for example, addressed a county's exclusion of public housing projects and approved an adverse-impact claim based on the disproportionate representation of African–Americans in the group of persons on the waiting list for public housing. Even being exceedingly generous in interpreting the "significant discriminatory effect" that suffices in lieu of motive evidence, this court concludes that Housing Investors' record is inadequate for want of specificity. Whether the measure of disparate impact used is disproportional representation, in which the percentage of minority representation in the affected group is compared against that minority's representation in the general population, or disproportionate adverse impact, in which the minority group's percentage representation in the affected group is compared against the majority group's representation in the affected group, the starting point is always the subset of the population that is affected by the disputed decision. *See* Schwartz, *supra*, at 76–80; Julia Lamber, Barbara Reskin, & Terry Morehead Dworkin, *The Relevance of Statistics to Prove Discrimination: A Typology*, 34 Hastings L.J. 553, 590–95 (1983). The relevant group in this case is the population of low-to moderate-income residents who would have been eligible for Housing Investors' proposed housing complex. It is that group, not all blacks in Clanton nor all low-income residents of Clanton, that is affected by the rezoning denial. It is from that group that Housing Investors must make its case for significant discriminatory effect. As Housing Investors has failed to develop an evidentiary record from which a reasonable jury could find disparate impact, that theory of a FHA violation will be dismissed.

■ The other option available for Housing Investors to make its case is discriminatory motive. The proof need not be that racial discrimination was the sole or dominant reason for the zoning decision, just that race played some role in the adverse decision. *See Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991)("In order to prevail under the Act, Sofarelli has to establish that race played *some role* in the actions of [the defendants].") (emphasis added); *Marable v. H. Walker & Assoc.*, 644 F.2d 390 (5th Cir.

Unit B 1981) ("A plaintiff bringing a claim under [the FHA and the Civil Rights Act] is not required to establish that his denial of housing was motivated solely by racial discrimination. It is sufficient that race was one significant factor considered by the defendants in dealing with the plaintiff.") (citations omitted). The test is essentially the same under the equal-protection clause, *see Arlington Heights*, 429 U.S. at 265–66, 97 S.Ct. at 563, and under §§ 1981 and 1982, *see General Building Contractors*, 458 U.S. at 389–90, 102 S.Ct. at 3149 (holding that the Civil Rights Act of 1866 and its modern successor statutes are governed by tests congruent with the fourteenth amendment because "of the close connection between these Acts and the Amendment").

Housing Investors has developed an evidentiary record from which a reasonable jury could conclude that race was a significant factor in the decision. What Housing Investors likely believes to be its best evidence is perhaps its shakiest: the questions asked by the Planning Commission delegation to the manager of Housing Investors' Columbiana complex about the racial and ethnic make-up of its residents could be strong evidence that race played a significant role in the rezoning denial, but the Planning Commission's decision at the meeting immediately following the Columbiana visit was to uphold, not reject, the first rezoning decision in Housing Investors' favor. Nonetheless, this evidence underscores the other evidence that members of the Planning Commission, in particular Gene Martin and Douglas Scott, were preoccupied with race in the months leading up to the eventual denial of Housing Investors' second request for rezoning.[8] Housing Investors thus has developed an evidentiary record from which a reasonable jury could conclude that race was a motivating factor.

The analysis does not end there. Housing Investors has made a prima facie case of discriminatory motive, but the burden shifts to the defendants to rebut the charge and then, if the defendants are successful, to the plaintiff to show that the defendants' rebuttal is pretextual. The defendants' burden for the FHA is to proffer a legitimate, nondiscriminatory reason for its decision, and the burden for equal protection is prove that the same decision would have resulted even if the racist motive had not been considered. *See Arlington Heights*, 429 U.S. at 271 n. 21, 97 S.Ct. at 566 n. 21; *United States Dep't Housing & Urban Dev. ex rel. Herron v. Blackwell*, 908 F.2d 864, 870 (11th Cir.1990).

The defendants have offered legitimate nondiscriminatory reasons for the denial of rezoning, among them concerns about congestion on U.S. Highway 31, problems of access to Country Club Road, and the increase in the number of rental units from 40 in the original proposal to 56 in the second proposal. However, the court cannot say with certainty on the present record that the these reasons are not pretextual, that is, were not concocted after the fact to justify a discriminatory motive.

*Harassment, Coercion, and Intimidation:* Housing Investors also alleges that the Clanton Country Club and the Chilton County Board of Education should be liable for harassment, coercion, and intimidation, in violation of § 3617 of the FHA. That section provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the other sections of the FHA. 42 U.S.C.A. § 3617. For evidence, Housing Investors cites the opposition of members of the

---

8. The deposition testimony of Phyllis Alexander, chopped into excerpts that have been submitted in multiple exhibits, does, when pieced together, suggest that both of these members of the Planning Commission and perhaps others were preoccupied with the racial composition of the proposed apartment complex. *See* deposition of Phyllis Alexander at 67–68 (Doc. no. 131) (Gene Martin), 62–63 (Doc. no. 126, exhibit 11) (Douglas Scott).

Board of Education and the Country Club at the public hearings and the racist comments made by some individuals during and after those meetings.

 Housing Investors has, for the most part, offered only evidence of political opposition voiced in public hearings before a local government entity to support its claim of a § 3617 violation. To determine whether such behaviors can constitute a violation of § 3617, this court looks first to the statute itself and the plain meaning of the words used. The impermissible acts are listed disjunctively as items in a series: "coerce, intimidate, threaten, or interfere." The words *coerce, intimidate,* and *threaten* are clearly words that suggest force, violence, undue pressure, abuse of power, and measures intended to induce fear. The conjunction *or* does imply that the final word, *interfere,* need not equate exactly with the preceding words, but the context established by all of these words strung together is that impermissible interference must be more than peaceable opposition through legal channels. Persuasive authority supports this view. In *Michigan Protection and Advocacy Service, Inc. v. Babin,* 799 F.Supp. 695 (E.D.Mich.1992) (Rosen, J.), *aff'd,* 18 F.3d 337 (6th Cir. 1994), for example, neighbors organized opposition to the establishment of a group home by picketing, launching a publicity campaign, and ultimately banding together to make a counteroffer on the disputed property and buying it; the court there held that, while the neighbors had thwarted the state's plans to buy the property and use it for a group home for the disabled, the defendants had nonetheless not engaged in impermissible interference through these legal means. This court does not need to discuss the petitions clause of the first amendment in order to decide that § 3617 does not reach the successful opposition by the Board of Education and the Country Club through its public statements in the Planning Commission and City Council hearings. As this theory is the only remaining basis for including the Chilton County Board of Education in the suit, the Board is dismissed from the suit.

 Housing Investors does offer additional evidence to support its § 3617 claim against the Clanton Country Club. Aside from the objections raised in the hearings themselves by various members of the Clanton Country Club, one member of the Country Club, David Puckett, told Herbert Dennis, the owner of the disputed property, that his plan to seek rezoning and sell to Housing Investors would "bring them out of West End in droves." Housing Investors explains that West End, also known as the Bottoms, is an economically depressed sector of the City of Clanton populated primarily by African–Americans. Even assuming that this one comment could constitute a § 3617 violation, Housing Investors has offered no evidence and no argument whatsoever to justify holding the Clanton Country Club liable for it. Country clubs may well be known for their historical and continuing practices of invidious discrimination, but Housing Investors cannot rely on this background assumption to justify imposition of liability. Absent a theory such as agency or conspiracy, there is no reason to hold Clanton Country Club liable. Housing Investors' § 3617 claim will be dismissed.

### D. Due Process

 Housing Investors also claims that the rezoning denial was an arbitrary and capricious decision and violated its due process rights. A decision can be shown to be unconstitutionally arbitrary and capricious "only when it is plain and palpable that it has no real or substantial relation to the public health, safety, morals, or to the general welfare." *Thomas Cusack Co. v. City of Chicago,* 242 U.S. 526, 530–31, 37 S.Ct. 190, 192, 61 L.Ed. 472 (1917). The conclusion that the rezoning denial bears no relation to public safety or the general welfare is not palpably plain. Concerns about locating the complex near the school and congestion on the surrounding streets are legitimate public welfare issues, and

denying Housing Investors' second rezoning request cannot be said to bear no relation at all to furthering the public welfare. Housing Investors' due-process claim will be dismissed.

### E. Declaratory Relief

Housing Investors also asks that the court, in the exercise of its supplemental jurisdiction, resolve whether the Country Club Road, including the strip of land along the side, is public or private. The court is without jurisdiction to entertain this request. At issue in this litigation is whether Housing Investors was discriminatorily denied the right to develop a housing complex. Whether the Country Club Road is 'in fact' public or private is not necessarily determinative; rather, the question is whether the City of Clanton believed in good faith that it was private. *See Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1501 (11th Cir.1985) (employer's belief, honest but mistaken, may nonetheless provide legitimate reason for discharge); *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir.1982) (to conclude that the asserted reason was not pretextual, the court need not determine that defendant was correct in its assessment of plaintiff's performance but need only determine that defendant in good faith believed plaintiff's performance was unsatisfactory). Therefore, settling title to a parcel of land is too tenuous to the main issue. Housing Investors should present that claim to the appropriate state court.

### F. Clanton Country Club and Chilton County Board of Education

Because there are no remaining claims against the Clanton Country Club and the Chilton County Board of Education, these defendants will be dismissed. Their dismissal, however, will be without prejudice. For example, Housing Investors may very well have a direct claim against the Country Club under § 1981 and § 1982 should, for racially discriminatory reasons, the club refuse to enter into a contract resolving the Country Club Road issue. As far as this court knows, Housing Investors has yet to pursue such resolution with the club.

### G. Claims under Alabama State Law

Finally, Housing Investors has raised three claims under Alabama state law, all of which are against the City of Clanton: that the rezoning denial was an arbitrary and capricious decision in violation of the due process clause of the Alabama constitution; that the Country Club Road should be declared a public road; and that the city should be equitably estopped from enforcing its rezoning denial after having induced detrimental reliance on the first favorable zoning decision. The court does not reach these claims at this time.

For the above reasons, it is ORDERED as follows:

(1) The following motions are granted in part only: the defendants' motion for summary judgment, filed August 10, 1998 (Doc. no. 43); the defendants' motion for summary judgment, filed March 11, 1999 (Doc. no. 104); the defendants' motion for summary judgment, filed March 15, 1999 (Doc. no. 111); the defendants' motion for summary judgment, filed May 28, 1999 (Doc. no. 129); and the defendants' motion for summary judgment, filed June 1, 1999 (Doc. no. 130).

(2) Plaintiff Robert Binion is dismissed for lack of standing.

(3) The plaintiffs' just-compensation claim is dismissed as not ripe.

(4) The individual defendants are dismissed in their 'official capacities,' and thus entirely.

(5) The plaintiffs' conspiracy claim under 42 U.S.C.A. § 1985 is dismissed.

(6) The plaintiffs' due process claim is dismissed.

(7) The plaintiffs' disparate-impact and § 3617 claims under the Fair Housing Act of 1968, as amended, 42 U.S.C.A. §§ 3601–3619, 3631, are dismissed.

(8) Defendant Clanton Country Club is dismissed without prejudice.

(9) Defendant Chilton County Board of Education is dismissed without prejudice.

It is further ORDERED as follows:

(1) The only remaining plaintiff is Housing Investors, Inc.

(2) The only remaining defendant is City of Clanton, Alabama.

(3) The only remaining claims are the federal claim for disparate treatment (that is, intentional discrimination) under the Fair Housing Act of 1968, as amended, 42 U.S.C.A. §§ 3601–3619, 3631, and the equal protection clause of the fourteenth amendment, and 42 U.S.C.A. §§ 1981 and 1982 as enforced through 42 U.S.C.A. § 1983; and the state-law claims.