## UNITED STATES *v.* CLARKE ET AL.

No. 78–1693.   Argued January 15, 16, 1980—Decided March 18, 1980

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, POWELL, and STEVENS, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which WHITE, J., joined, *post,* p. 259.

*Harlon L. Dalton* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Dirk Snel,* and *Carl Strass. Robert S. Pelcyger* argued the cause for Bertha Mae Tabbytite, respondent under this Court's Rule 21 (4), in support of the United States. With him on the briefs was *Vincent Vitale.*

*Richard Arthur Weinig* argued the cause and filed a brief for respondents.

Mr. Justice Rehnquist delivered the opinion of the Court.

We granted the petition for certiorari of the United States in this case, 444 U. S. 822, to decide the question "[w]hether 25 U. S. C. [§] 357 authorizes a state or local government to 'condemn' allotted Indian trust lands by physical occupation." Pet. for Cert. 2. That statute, in turn, provides in pertinent part:

> "[L]ands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee." 31 Stat. 1084.

We think this is a case in which the meaning of a statute may be determined by the admittedly old-fashioned but nonetheless still entirely appropriate "plain meaning" canon of statutory construction. We further believe that the word "condemned," at least as it was commonly used in 1901, when 25 U. S. C. § 357 was enacted, had reference to a judicial proceeding instituted for the purpose of acquiring title to private property and paying just compensation for it.

Both the factual and legal background of the case are complicated, but these complications lose their significance under our interpretation of § 357. For it is conceded that neither the city of Glen Alps nor the city of Anchorage, both Alaska municipal corporations, ever brought an action to condemn the lands here in question in federal court as required by *Minnesota* v. *United States*, 305 U. S. 382 (1939). And since we hold that only in such a formal judicial proceeding may lands such as this be acquired, the complex factual and legal history of the dispute between the Government, respondents Glen M. Clarke et al., and respondent Bertha Mae Tabbytite need not be recited in detail.[1]

---

[1] Respondent Tabbytite lost in the Court of Appeals for the Ninth Circuit and did not petition for certiorari from that decision. She is there-

The Court of Appeals for the Ninth Circuit held that § 357 permits acquisition of allotted lands by what has come to be known as "inverse condemnation." 590 F. 2d 765 (1979). In so holding, the court reasoned that "once the taking has been accomplished by the state it serves little purpose to interpret the statute to refuse to permit an inverse condemnation suit to be maintained on the groun[d] that the state should have filed an eminent domain action prior to the taking." *Id.*, at 767. We disagree with the Court of Appeals and accordingly reverse the judgment.

There are important legal and practical differences between an inverse condemnation suit and a condemnation proceeding. Although a landowner's action to recover just compensation for a taking by physical intrusion has come to be referred to as "inverse" or "reverse" condemnation, the simple terms "condemn" and "condemnation" are not commonly used to describe such an action. Rather, a "condemnation" proceeding is commonly understood to be an action brought *by* a condemning authority such as the Government in the exercise of its power of eminent domain. In *United States* v. *Lynah,* 188 U. S. 445 (1903), for example, which held that the Federal Government's permanent flooding of the plaintiff's land constituted a compensable "taking" under the Fifth Amendment, this Court consistently made separate reference to condemnation proceedings and to the landowner's cause of action to recover damages for the taking. *Id.*, at 462, 467, 468.[2]

fore a respondent in this Court. This Court's Rule 21 (4). Her counsel has filed both a brief and reply brief adopting the statements of the case and the arguments set forth in the brief for the United States, but principally devoted to "matters not included in the Brief of the United States." Since we agree with the position advanced by the United States, we need not decide whether Tabbytite's arguments comply with this Court's Rule 40 (1)(d)(2). See also Rule 40 (3).

[2] The landowner's right to sue for damages was based on the theory that if a landowner were entitled to have governmental agents enjoined from taking his land without implementing condemnation proceedings, he also was entitled to waive that right and to demand just compensation as if the

More recent decisions of this Court reaffirm this well-established distinction between condemnation actions and physical takings by governmental bodies that may entitle a landowner to sue for compensation. Thus, in *Ivanhoe Irrigation District* v. *McCracken*, 357 U. S. 275, 291 (1958), when discussing the acquisition by the Government of property rights necessary to carry out a reclamation project, this Court stated that such rights must be acquired by "paying just compensation therefor, either through condemnation or, if already taken, through action of the owners in the courts." And in *United States* v. *Dickinson*, 331 U. S. 745, 749 (1947), this Court referred to the Government's choice "not to condemn land but to bring about a taking by a continuous process of physical events." See also *id.*, at 747–748; *Dugan* v. *Rank*, 372 U. S. 609, 619 (1963).[3]

Government had taken his property under its sovereign right of eminent domain. 188 U. S., at 462. See also, *e. g.*, *United States* v. *Great Falls Manufacturing Co.*, 112 U. S. 645, 656 (1884). Cf. *United States* v. *Lee*, 106 U. S. 196 (1882) (holding that landowner could bring suit for ejectment against federal officials who took possession of land without bringing condemnation proceedings); *Winslow* v. *Baltimore & Ohio R. Co.*, 188 U. S. 646, 660–661 (1903) (after declining to treat a suit for damages by a landowner as a condemnation action, the Court directed the lower court to enjoin temporarily proceedings brought by the landowner to dispossess the railroad company from the land "in order to enable [the railroad company] to condemn such land in proper proceedings for that purpose, which cannot be taken in the present suit").

[3] Also, in *United States* v. *Dow*, 357 U. S. 17, 21 (1958), this Court stated:

"Broadly speaking, the United States may take property pursuant to its power of eminent domain in one of two ways: it can enter into physical possession of property without authority of a court order; or it can institute condemnation proceedings under various Acts of Congress providing authority for such takings. Under the first method—physical seizure—no condemnation proceedings are instituted, and the property owner is provided a remedy under the Tucker Act, 28 U. S. C. §§ 1346 (a) (2) and 1491, to recover just compensation. See *Hurley* v. *Kincaid*, 285 U. S. 95, 104. Under the second procedure the Government may either employ statutes

The phrase "inverse condemnation" appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted. As defined by one land use planning expert, "[i]nverse condemnation is *'a cause of action against a governmental defendant* to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.'" D. Hagman, Urban Planning and Land Development Control Law 328 (1971) (emphasis added). A landowner is entitled to bring such an action as a result of "the self-executing character of the constitutional provision with respect to compensation. . . ." See 6 P. Nichols, Eminent Domain § 25.41 (3d rev. ed. 1972). A condemnation proceeding, by contrast, typically involves an action by the condemnor to effect a taking and acquire title. The phrase "inverse condemnation," as a common understanding of that phrase would suggest, simply describes an action that is the "inverse" or "reverse" of a condemnation proceeding.

There are also important practical differences between condemnation proceedings and actions by landowners to recover compensation for "inverse condemnation." Condemnation proceedings, depending on the applicable statute, require various affirmative action on the part of the condemning authority. To accomplish a taking by seizure, on the other hand, a condemning authority need only occupy the land in question. Such a taking thus shifts to the landowner the burden to discover the encroachment and to take affirmative action to recover just compensation. And in the case of Indian trust

---

which require it to pay over the judicially determined compensation before it can enter upon the land, . . . or proceed under other statutes which enable it to take immediate possession upon order of court before the amount of just compensation has been ascertained."

lands, which present the Government " 'with an almost staggering problem in attempting to discharge its trust obligations with respect to thousands upon thousands of scattered Indian allotments,' " *Poafpybitty* v. *Skelly Oil Co.,* 390 U. S. 365, 374 (1968), the United States may be placed at a significant disadvantage by this shifting of the initiative from the condemning authority to the condemnee.

Likewise, the choice of the condemning authority to take property by physical invasion rather than by a formal condemnation action may also have important monetary consequences. The value of property taken by a governmental body is to be ascertained as of the date of taking. *United States* v. *Miller,* 317 U. S. 369, 374 (1943). In a condemnation proceeding, the taking generally occurs sometime during the course of the proceeding, and thus compensation is based on a relatively current valuation of the land. See 1 L. Orgel, Valuation in Eminent Domain § 21, n. 29 (2d ed. 1953). When a taking occurs by physical invasion, on the other hand, the usual rule is that the time of the invasion constitutes the act of taking, and "[i]t is that event which gives rise to the claim for compensation and fixes the date as of which the land is to be valued. . . ." *United States* v. *Dow,* 357 U. S. 17, 22 (1958).

Thus, even assuming that the term "inverse condemnation" were in use in 1901 to the same extent as it is today, there are sufficient legal and practical differences between "condemnation" and "inverse condemnation" to convince us that when § 357 authorizes the condemnation of lands pursuant to the laws of a State or Territory, the term "condemned" refers not to an action by a landowner to recover compensation for a taking, but to a formal condemnation proceeding instituted by the condemning authority.[4]

---

[4] The legislative history of § 357 does not provide any meaningful guidance as to the meaning of "condemned." The language eventually adopted as § 357 was not part of the original bill. It was inserted, without com-

Respondent municipality of Anchorage argues that the action authorized by the Court of Appeals here should be regarded as one in condemnation because Alaska law allows the "exercise of the power of eminent domain through inverse condemnation or a taking in the nature of inverse condemnation." Brief for Respondent Municipality of Anchorage 16. But we do not reach questions of Alaska law here because 25 U. S. C. § 357, although prescribing that allotted lands "may be condemned for any public purpose under the laws of the State or Territory where located," requires that they nonetheless be "condemned." It is conceded that there has never been a formal condemnation action instituted in this case. Since we construe such an action to be an indispensable prerequisite for the reliance of any State or Territory on the other provisions of this section, we therefore reverse the judgment of the Court of Appeals.

*Reversed.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE WHITE joins, dissenting.

Since the Court's opinion sets forth none of the facts of this case, it may be well to mention at least a few.

Bertha Mae Tabbytite, an American Indian, in 1954 settled on a 160-acre plot in the Chugach Mountains southeast of Anchorage, Alaska. She initially sought to perfect her claim to the land under the homestead laws and thereby to obtain an unrestricted fee title. Her applications for this were unsuccessful, however, and in 1966 Tabbytite agreed to accept a restricted trust patent to the land as an Indian allottee. As a result, the legal title remains in the United States, and

---

ment or discussion, on the Senate floor. 34 Cong. Rec. 1448 (1901). And the House Report only briefly discussed § 3 of the Act, to which § 357 was added. It stated: "Fifth. Providing for the opening of highways through like lands under State and Territorial laws and upon the payment of compensation." H. R. Rep. No. 2064, 56th Cong., 2d Sess., 3 (1900).

Tabbytite's powers of alienation are restricted. See 25 U. S. C. § 348.

Meanwhile, in 1958 Glen Clarke and his wife applied for a homestead patent on 80 acres adjoining the Tabbytite allotment. Two months later, without obtaining an easement, they constructed a road across that land. The Clarkes repeatedly contested Tabbytite's homestead application and prevented her from perfecting her patent. After securing their own patent in 1961, the Clarkes subdivided their property into 40 parcels, most of which were sold to others before this litigation began. That subdivision and surrounding lands were incorporated in June 1961 as a third-class city called Glen Alps. As a third-class city under Alaska law, Glen Alps did not possess the power of eminent domain.

In 1969, the United States filed the present action for damages and to enjoin the use of the road across the Tabbytite allotment. The District Court awarded damages for trespass but denied the injunction. The court concluded that the road was a "way of necessity," and that closing the road would cause "hardship" to the defendants. On the initial appeal to the United States Court of Appeals for the Ninth Circuit, that court reversed and did so on the grounds that upon entry in 1954 Tabbytite's title to the land was good against everyone except the United States Government, and that the Clarkes were not successors in interest to an easement implicitly retained by the Government. 529 F. 2d 984 (1976).

That ruling, however, was not the end of the case. In September 1975, the municipality of Anchorage annexed Glen Alps and apparently took over maintenance of the roadway. On the remand to the District Court, the municipality entered the proceedings and opposed an injunction on the ground that it already had effectively exercised its power of eminent domain by "inverse condemnation." The United States took the position that the federal statute consenting to condemnation of allotted lands, 25 U. S. C. § 357, does not authorize

inverse condemnation. The District Court ruled that under the federal statute, state law determines the propriety of condemnation proceedings and that Alaska law, indeed, recognized "inverse condemnation." The court held, accordingly, that Tabbytite was entitled to just compensation, but that an injunction should not issue.

On appeal, the Ninth Circuit affirmed and remanded the case for further proceedings. 590 F. 2d 765 (1979). It agreed with the District Court that § 357 permits a State to take Indian land by paying compensation in an inverse condemnation action. It reasoned that "once the taking has been accomplished by the state it serves little purpose to interpret the statute to refuse to permit an inverse condemnation suit to be maintained on the grounds that the state should have filed an eminent domain action prior to the taking." 590 F. 2d, at 767. It observed that "it seems a contradiction to deny Indian beneficial owners a cause of action for damages under the guise of protecting their rights." It predicted that its holding would encourage States and political subdivisions to act "with more circumspection, not less, when governmental activities conflict with ownership rights of Indian trust lands." *Ibid.*

I find the opinion of the Ninth Circuit persuasive. The present case is not a dispute about a right but about a remedy. There is, of course, no question that if § 357 applies, Anchorage. has the right to take Tabbytite's property through traditional eminent domain proceedings, and that Tabbytite has a right to just compensation if it does so. The case centers, however, in the fact that the municipality already has taken an interest in the property without a formal proceeding; the issue, then, is whether an after-the-fact award of just compensation is an adequate remedy. The dispute is in the measure of damages.

There is no question that inverse condemnation is recognized by Alaska law in circumstances similar to the present case. *State of Alaska, Dept. of Highways v. Crosby,* 410 P.

2d 724 (Alaska 1966); *City of Anchorage* v. *Nesbett,* 530 P. 2d 1324 (Alaska 1975).* As I read § 357, it does not prohibit resort to inverse condemnation under state law. The statute explicitly refers to state law, and I read in the statute no specialized definition of the term "condemned" as a matter of federal law.

The United States and Tabbytite perhaps are concerned that in an action for inverse condemnation, the property interest will be valued at the earlier date of the entry rather than at the subsequent date of the institution of formal condemnation proceedings. The inference, of course, is that the property interest will have appreciated in value in the interim, to the advantage of the Indian allottee. I suspect that this argument has more form than substance. Interest during the intervening period will make up much of the difference. And still more of that difference might well be the result of the improvement for which eminent domain is belatedly invoked. There is perhaps little reason to doubt, in this very case, that the Tabbytite property is more valuable because it is crossed by a graded, improved, and publicly maintained road.

For these reasons, I would affirm the judgment of the Court of Appeals, and I respectfully dissent from the Court's reversal of that judgment.

---

*It is not clear that Alaska law would permit deliberate resort to inverse condemnation as a means of avoiding initiation of formal condemnation proceedings. That issue is not before us, since Anchorage first assumed responsibility for the road under a claim of right under the first judgment of the District Court.