921 A.2d 470 (2007)
392 N.J. Super. 499
Henry E. RAAB and Clara V. Montagna, Plaintiffs-Appellants,
v.
BOROUGH OF AVALON, Defendant/Third-Party Plaintiff-Respondent,
v.
State of New Jersey, Department of Environmental Protection,[1] Third-Party Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 20, 2006.
Decided April 30, 2007.
*471 Marc D. Haefner, Roseland, argued the cause for appellants (Connell Foley, attorneys; Frederick W. Schmidt, Jr., Cape May Courthouse, of counsel; Mr. Haefner and Tricia B. O'Reilly, Roseland, of counsel and on the brief). Michael J. Donohue, Stone Harbor, argued the cause for respondent Borough of Avalon.
Lewin J. Weyl, Deputy Attorney General, argued the cause for respondent State of New Jersey, Department of Environmental Protection (Stuart Rabner, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Brian Weeks, Deputy Attorney General, on the brief).
Before Judges CUFF, FUENTES and BAXTER.
The opinion of the court was delivered by
FUENTES, J.A.D.
Plaintiffs, Henry E. Raab and Clara V. Montagna, appeal from the summary judgment dismissal of their claims against defendant, Borough of Avalon ("the Borough"). Plaintiffs sought compensation for the physical taking of their property by *472 the Borough, together with damages under 42 U.S.C.A. § 1983.
Plaintiffs' complaint concerned vacant oceanfront property that the parties stipulated is not capable of development, because it is situated directly between the Borough's dune line established in 1968, and the ocean high-water line. Plaintiffs contend that the trial court erred: (1) by failing to apply the doctrine of waiver to the Borough's statute of limitations defense; (2) granting summary judgment while discovery was still pending; (3) refusing to apply the limitation period for adverse possession of land to the facts of this case; and (4) by finding that plaintiffs' claim for imposition of an easement by necessity was time-barred. As an alternate theory of liability, plaintiffs also argued that the Borough's actions should be viewed as a continuous trespass, subject to judicial redress until such trespass ceases.
Thus, as framed by the parties, this appeal requires us to determine the applicable limitation period within which a private party must commence an action to challenge the taking of private property by a public entity, as an exercise of its police power, where the public entity's actions fail to comply with any of the statutory provisions governing the use of eminent domain. This precise question of law has not been directly addressed or reviewed in any published opinion of the courts of this State.
To answer this question, we first define the nature of the governmental action involved. Applying the definition of inverse condemnation articulated by our Supreme Court in Greenway Development Co. v. Borough of Paramus, 163 N.J. 546, 553, 750 A.2d 764 (2000), we now hold that the physical taking of real property by a governmental agency, without compliance with the statutory safeguards established by the Legislature for the lawful exercise of the power of eminent domain, constitutes an act of inverse condemnation.
We further hold that a cause of action against a governmental defendant to recover the value of the real property that was taken by inverse condemnation is governed by the provisions of N.J.S.A. 2A:14-1 -2, and must be filed within six years from the date of accrual, which is defined as the date the landowner becomes aware or, through the exercise of reasonable diligence, should have become aware, that he or she had been deprived of all reasonably beneficial use of the property. Russo Farms, Inc. v. Vineland Bd. of Educ., 280 N.J.Super. 320, 325, 655 A.2d 447 (App. Div.1995), aff'd in part and rev'd in part on other grounds, 144 N.J. 84, 675 A.2d 1077 (1996); Harisadan v. City of E. Orange, 187 N.J.Super. 65, 68-69, 453 A.2d 888 (App.Div.1982).
In this context, we affirm the trial court's grant of summary judgment in favor of the municipal defendant because plaintiffs' inverse condemnation action was filed more than six years beyond its accrual date. Consequently, we reject all of plaintiffs' arguments, including those seeking to characterize the municipality's actions as a continuing trespass, otherwise subject to judicial redress until its cessation.
We will examine and discuss these issues in the following factual context.

I
This case concerns a piece of vacant beachfront property within the Borough of Avalon, situated at Block 76.03 (formerly Block 76C), and covering Lots 12, 14, 16, 18, 20, 64 and 107, as identified on the Borough's current tax map ("the property"). By the time this matter came before the trial court on May 13, 2005, the property no longer had direct access to *473 76th Street, and there was a forty-foot strip of land that was owned by the Borough and was located between the property and the end of 76th Street.
A sand dune also runs along the western edge of the strip, nearest to the street. Across the sand dune and the strip is a dirt walkway and boardwalk that the Borough uses as the public right-of-way from 76th Street, across the north end of the property, to the public beach. The walkway contained signs directing pedestrian traffic to the beach. It has existed for over forty years. The public beach surrounds the property on the east and south sides, and the ocean high-water line is east of the beach.
In August 1961, the Borough owned the property, which had direct access onto the dirt roadway of 76th Street. By Resolution No. 7033, the Borough formally proclaimed that the property was not needed for public use, and sold it to Tri-Guy Holding Company, Inc. ("Tri-Guy"), a New Jersey corporation, owned by Thomas Tufaro, plaintiff Henry Raab, and George Montagna, husband of plaintiff Clara Montagna. Tri-Guy bought the property for one dollar plus the transfer to the Borough of two other beachfront lots that it owned, and had once purchased from the Borough.

A

The Nor'easter
In March 1962, an Atlantic "Nor'easter" storm devastated much of the New Jersey coastline, including the Borough, which is situated on a barrier island. The storm obliterated the beach; washed the end of 76th Street into the ocean; and transformed the property into a tidal area of oceanfront.
As a result, the Borough passed various ordinances to protect and rebuild the shoreline. Resolution No. 62-102, dated August 15, 1962, declared that it was in the Borough's "best interests . . . to restore the sand dunes, vegetation and other protections [that] existed along the shore line." In pursuit of this goal, the Resolution authorized the municipal officials and their representatives
to enter immediately upon property to be used as protective barriers to take control and possession thereof, and to do such acts as may be required, including removing, destroying or otherwise disposing of any property located thereon without first paying any compensation therefor.
The resolution further provided
that nothing in this resolution shall be construed to deny to any person who has interest in any property which has been possessed by the Borough of Avalon the right to obtain therefore just compensation to the extent that such property shall have been taken by the Borough. No compensation shall be granted to any individual to the extent that the action of the Borough of Avalon does not amount to a taking of property but to a reasonable regulation of property pursuant to a proper exercise of the police power.
Resolution No. 62-103, also dated August 15, 1962, authorized the Borough to use its emergency powers to dispense with the bidding process and to "immediately" construct "protective barriers in the form of Sand Dunes between 13th and 80th Streets."
Finally, Resolution No. 62-117, dated September 19, 1962, permitted the Borough's chief executive official to enter into an agreement to "acquire all lands, easements, rights of way or other areas within the municipality if required in connection with" constructing the protective barrier and to "do such other acts as may be *474 necessary to carry out the terms of the Agreement."

B

Compensation Efforts
In November 1962, the Borough instituted a property-exchange program as a means of compensating property owners whose lots had been taken as a result of the storm. Under this program, affected owners could exchange their former lots for Borough-owned lots of equal or greater value, provided that the owner agreed to pay any difference in the value. Despite this tacit acknowledgment of a taking, the Borough still held property owners responsible for the taxes on their lots. This was made clear in letters sent to property owners after the storm.
As part of the shoring-up and rebuilding effort, the Borough also constructed a dune that ran the entire length of the municipality, along the storm-created ends of each street. Although there is no specific date as to when this dune was built, based on a letter from Tri-Guy to the Borough dated April 29, 1965, it appears that (1) the dune was already in place as of April 26, 1965, (2) Tri-Guy knew it could not build on the property, and (3) Tri-Guy wanted to participate in the Borough's land-exchange program. The April 29 letter read, in part:
Dear Sir:
This letter is in regard to our conversation of April 26, 1965, at your office. In 1961, we owned Block # 9A, Lots 19-20 on 9th Street, ocean front (110 x 110). A storm came along and washed away a portion of it. The Borough of Avalon asked us to exchange these lots so that the Borough could erect a Bulk Head to prevent any further soil erosion of the island.
. . . .
In exchange we accepted [the property]. On April 26, we visited the lots with the intention of building a home, and we found that the sand barrier [is] on the property in question and we cannot, therefore, build on those lots. We are now requesting that the Borough of Avalon exchange [the property] for Block # 68C1 Lots 1, 2, and 3, which have a comparable assessed value of $6,600, and is presently owned by the Borough of Avalon.
We understand that the Borough has a formula that they use in similar cases of this type. Will you please give this your kindest attention.
[(Emphasis added.)]
By letter dated May 25, 1965, the Borough rejected Tri-Guy's proposed exchange because the lots Tri-Guy had chosen were "valued at more than three times the original assessed value of [the property]." In response, Tri-Guy wrote on June 25, 1965, proposing the exchange of three different lots. Although the record does not contain the Borough's specific response to this counter-proposal, we are satisfied that the parties failed to reach an agreement.

C

Manifestation of a Taking
In June 1968, the Borough adopted the "Beach Protection Ordinance," Ordinance No. 393, which expressly delineated the "dune line" and prohibited the removal or redistribution of sand on all lands east of the dune line, except for recreation and unless approved by the Borough Commissioners. The "dune line" was defined as "that certain line established by the Borough of Avalon . . . [, which] shall exist and be established regardless of whether or not actual sand dunes are situate thereon." *475 The dune line was drawn such that the entire property was east of the line.[2]
In January 1969, Tri-Guy conveyed the property for $600 to its three principals: Tufaro, plaintiff Raab, and George Montagna. In September 1969, the Borough adopted Ordinance No. 416, which eliminated any right-of-way access through the property to 76th Street. Specifically, the ordinance declared that:
The public right, title and interest in, along and upon that portion of the public street known as SEVENTY-SIXTH STREET in the Borough of Avalon, New Jersey, . . . is hereby vacated, surrendered and abandoned.
[More particularly described as follows:]
All that portion of SEVENTY-SIXTH STREET, 60 feet wide, from a point 445 feet Southeastwardly from the Southeasterly line of Dune Drive, Southeastwardly to the high water line of the Atlantic Ocean.

[(Emphasis added.)]
In December 1971, the Borough adopted Ordinance No. 468, creating a beach fee program, requiring all those wishing to access the beach to pay a fee to travel from 76th Street to the property. In January 1979, the Borough adopted Ordinance No. 614, changing the zoning for the property from residential use to P-U (public use), prohibiting all permanent construction, except for limited recreational use.
In June 1979, the Borough adopted Ordinance No. 628, prohibiting all construction on beaches and dunes, except for development that had no prudent or feasible alternatives and would not cause significant adverse long-term impact on the natural functioning of the beach or dune system. This ordinance was modified by three subsequent ordinances prohibiting construction on any parcel, public or private, east of the dune line unless approved by the Borough's Zoning Board of Adjustment.[3]
In November 1982, counsel for Tri-Guy's principals sent a letter to the Borough inquiring as to the status of the property. The copy of this letter included in plaintiffs' appendix is barely legible. Using the Borough's December 8, 1982, response as a reference, there is clear evidence to conclude that the principals were aware that the establishment of the dune line effectively prevented any development on the property. Specifically, the Borough's response noted that: "The Borough Clerk's Office is still researching the files in order that I can answer your question as to whether any consideration was paid by the Borough to the lot owners whose lots were rendered unbuildable [sic] by the adoption of the Dune Line." By letter dated July 21, 1983, the Borough formally advised the principals that it was "not interested in purchasing" the property.
In the summer of 1994, the Borough received funds from the State Department of Environmental Protection ("DEP") to restore and replenish the beach area. The Borough's agreement with the State required private property owners who wanted to build in the erosion hazard area, which included the property at issue here, to first submit their plan to the DEP for review and approval.
In June 1997, Tri-Guy's principals or their estates "sold" the property to plaintiffs for $70. In a letter to the Borough *476 dated March 16, 2001, plaintiffs declared their intention "to sell" the property "to any willing purchaser or [to] the Borough for a fair market price that assumes the lot can be used for the construction of a single family residence." In the event the Borough was not interested in purchasing the property, plaintiffs requested that the property be "rezone[d] . . . to permit construction of a single family residence, which is compatible with the existing neighborhood, and [to] move the dune line to the east side of the [property]." If this proposal was rejected, plaintiffs indicated that they would "sue the Borough for `inverse condemnation.'" On April 26, 2002, plaintiffs filed their complaint.

II
In his memorandum of opinion, Judge Visalli concluded that plaintiffs' claims were time-barred. The Judge found that, as successor in title to the original owners, plaintiffs were bound by the content of the letter dated April 29, 1965, which demonstrated a clear awareness that the Borough "had entered their property and constructed a dune thereon, thus effectively `taking' their property." Relying on our holdings in Harisadan and Russo Farms, Judge Visalli held that plaintiffs' cause of action filed in 2002 was barred by the six-year statute of limitations in N.J.S.A. 2A:14-1, because their claims accrued as of April 29, 1965. Specifically, Judge Visalli noted that:
Plaintiffs do not dispute the content of the letter dated April 29, 1965. Nor do plaintiffs present any evidence that disputes same. Accordingly, the Court finds that as of at least April 29, 1965, plaintiffs had knowledge that Avalon entered their property and took control via the dune's construction, thus effectuating a taking. Upon discovering Avalon's action, plaintiffs had the burden to take the appropriate action to seek compensation timely.
We agree with Judge Visalli's analysis and ultimate conclusion, and therefore affirm.
In United States v. Clarke, 445 U.S. 253, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980), the Supreme Court reviewed the propriety of a governmental condemnation of private property, through the physical occupation of such property, without the benefit of legal process. In this context, the Court discussed the analytical differences between "condemnation" and "inverse condemnation."
The phrase "inverse condemnation" appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted. As defined by one land use planning expert, "[inverse] condemnation is `a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.'" A landowner is entitled to bring such an action as a result of "the self-executing character of the constitutional provision with respect to compensation." A condemnation proceeding, by contrast, typically involves an action by the condemnor to effect a taking and acquire title. The phrase "inverse condemnation," as a common understanding of that phrase would suggest, simply describes an action that is the "inverse" or "reverse" of a condemnation proceeding.
There are also important practical differences between condemnation proceedings and actions by landowners to recover compensation for `inverse condemnation.' Condemnation proceedings, *477 depending on the applicable statute, require various affirmative action on the part of the condemning authority. To accomplish a taking by seizure, on the other hand, a condemning authority need only occupy the land in question. Such a taking thus shifts to the landowner the burden to discover the encroachment and to take affirmative action to recover just compensation.

[Id. at 257, 100 S.Ct. at 1130, 63 L.Ed.2d at 377 (internal citations omitted) (emphasis added).]
In New Jersey, our Supreme Court has reviewed the question of inverse condemnation in the context of excessive use of the state's police power in the form of overreaching regulatory schemes that operate effectively to deprive the private property owner "of all or substantially all of the beneficial use of the totality of his property." Greenway Dev. Co., supra, 163 N.J. at 553, 750 A.2d 764 (quoting Pinkowski v. Twp. of Montclair, 299 N.J.Super. 557, 575, 691 A.2d 837 (App.Div.1997)). We have also recognized that an unconstitutional taking occurs when the state physically occupies private property for public use. Pinkowski, supra, 299 N.J.Super. at 575, 691 A.2d 837.
Applying these principles to the facts developed before the trial court, there is no question that the Borough's actions in physically appropriating plaintiffs' property constituted a "taking." Further, because such taking was accomplished without the benefit of judicial process, as envisioned by the Legislature when it adopted N.J.S.A. 20:1-36,[4] it is viewed as an inverse condemnation, shifting the burden to the aggrieved landowner "to discover the encroachment and to take affirmative action to recover just compensation." Clarke, supra, 445 U.S. at 257, 100 S.Ct. at 1130, 63 L.Ed.2d at 378.
In this light, we agree with Judge Visalli that the letter dated April 29, 1965, clearly shows that plaintiffs' predecessors in title were aware that a physical taking of their property had occurred, entitling them to compensation. The following passage illustrates the point.
On April 26, we visited the lots with the intention of building a home, and we found that the sand barrier in [sic] on the property in question and we cannot, therefore, build on those lots. We are now requesting that the Borough of Avalon exchange [the property] for Block # 68C1 Lots 1, 2, and 3, which have a comparable assessed value of $6,600, and is presently owned by the Borough of Avalon.
Thus, plaintiffs' cause of action for inverse condemnation accrued on or about April 26, 1965.
With respect to the time period within which a cause of action for inverse condemnation must be brought, it is now well-settled that the six-year period in N.J.S.A. 2A:14-1 constitutes the relevant standard. In Russo Farms, we reviewed a claim of inverse condemnation in relation to flooding on the plaintiffs' farmland. Russo Farms, supra, 280 N.J.Super. at 325, 655 A.2d 447. Relying on Harisadan and Morey v. Essex County, 94 N.J.L. 427, 430, 110 A. 905 (E. & A.1920), we held that those claims were subject to the six-year statute of limitations in N.J.S.A. 2A:14-1. Russo Farms, supra, 280 N.J.Super. at 325, 655 A.2d 447.
In contrast to the facts here, the inverse condemnation claims in Russo Farms *478 "continued to accrue" as long as the defendant's conduct caused the property to be subject to continual flooding. Id. at 327, 655 A.2d 447. Thus, because flooding continued to occur within the six years preceding the complaint, the claims were not time-barred. Ibid. We reached a similar conclusion in Harisadan.
In Harisadan, the property at issue was situated within a region declared blighted and targeted for redevelopment. Harisadan, supra, 187 N.J.Super. at 66-67, 453 A.2d 888. The property remained "under a constant threat of condemnation for ten years," causing a deterioration of value, vacancies, and lost income to both the owner and the major tenant. Id. at 67, 453 A.2d 888. Applying N.J.S.A. 2A:14-1, we held that "[u]ntil the municipal action causing the injury is withdrawn or the project abandoned, the undue infringement upon the use of property continues." Id. at 68-69, 453 A.2d 888. We found that "[t]he continuing failure or refusal to condemn" the property had caused the property to remain under the threat of condemnation, so the plaintiffs' cause of action did not "accrue" at the point of the initial blight declaration, and the statute of limitations had not run. Id. at 70, 453 A.2d 888.
Morey is the oldest case espousing the notion of "continuing violation" as a means of extending the limitations period. In Morey, the plaintiffs' property fronted on a county road. Morey, supra, 94 N.J.L. at 427, 110 A. 905. At some point in 1912, the county straightened a curve in the road, taking possession of and filling a portion of the plaintiffs' property to use for the roadway without providing compensation. Id. at 428, 110 A. 905. The county defended its actions solely by claiming that the six-year statute of limitations had run. Ibid. The case went to a jury, and the trial court charged that the statute of limitations was no bar to recovery because the trespass was a continuous one. Id. at 428-29, 110 A. 905. On appeal from a verdict in the plaintiffs' favor, the Court of Errors and Appeals affirmed, holding:
The right of action of the plaintiffs does not rest entirely upon the original tortious entry and partial destruction of their property, but upon the continued occupation and use of the property by the defendant following the original entry. The plaintiffs were entitled to sue as soon as the primary tortious act was committed, and would have been entitled to recover damages up to the time of the institution of the suit. . . . In other words, the constant repetition of the defendant's unlawful acts, its persistence in its wrongful occupation of plaintiffs' land, constituted a continuous trespass. . . .
[Id. at 430, 110 A. 905 (emphasis added).]
Thus, the Court in Morey held that the plaintiffs were entitled to recover damages for the six-year period preceding the complaint, and it expressed no opinion on whether damages could be recovered for any earlier period, as that issue had not been raised in the appeal. Ibid.
Finally, in 287 Corporate Center Associates. v. Township of Bridgewater, 101 F.3d 320 (3d Cir.1996), acknowledging that neither 42 U.S.C.A. § 1983, nor the Fifth Amendment include a statute of limitations provision, the court reaffirmed the principle that, in such situations, "we must look to the most `appropriate' or `analogous' state statute of limitations." Id. at 323 (quoting Wilson v. Garcia, 471 U.S. 261, 268, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254, 261 (1985)). After reviewing the relevant New Jersey cases, including Russo Farms and Harisadan, the Third Circuit concluded that the plaintiff's claim for inverse condemnation was barred by the six-year limitation period in N.J.S.A. 2A:14-1. In *479 so doing, the court specifically rejected the plaintiff's "continuing violation" argument, noting that "the Township has not committed an affirmative act since . . . the alleged taking stabilized almost ten years before Associates filed its lawsuit." Id. at 324.
Here, the taking was complete when the Borough came upon the property; took exclusive possession of it; and through a series of municipal resolutions, appropriated, transformed, and built upon the property to accomplish its express public purpose: the restoration and protection of the shore line. All this was accomplished in 1965. Thus, there is no factual support for applying the "continuing wrong" doctrine to rescue plaintiffs from the legal consequences of their deliberate inactions.
By way of summary, the record developed before the trial court indisputably established that, as of April 1965, (1) plaintiffs' predecessor in title was aware that the Borough had exercised control and dominion over the property, effectively depriving it of all or reasonably all of the property's beneficial use; (2) the Borough's actions constituted an inverse condemnation, because they were carried out without compliance with any of the statutory provisions governing the exercise of eminent domain; and (3) these title holders did not initiate any legal challenge to this de facto taking until well beyond the six-year statute of limitations applicable to inverse condemnations. Given these facts, plaintiffs' claims are barred.
Affirmed.
NOTES
[1] The Borough's third-party complaint against the Department of Environmental Protection was dismissed by stipulation of the parties.
[2] Ordinance No. 415, adopted in August 1969, and Ordinance No. 442, adopted in October 1970, described the dune line as being east of the property.
[3] See Ordinance No. 202-86, adopted in August 1986; Ordinance No. 216-87, adopted in January 1987; and Ordinance No. 236-87 in October 1987.
[4] The statute cited was the one in existence in 1962. It was repealed by L.1971, c. 361, § 49.