LYONS, Special Chief Justice.[1]
Portersville Bay Oyster Company, LLC ("the Oyster Company"), and its members, *126 Troy Cornelius and his wife, Rebecca Cornelius, are the plaintiffs in a civil action against 4H Construction Corporation, Greystone Industries, LLC, and Christopher Blankenship, in his official capacity as Commissioner of the Alabama Department of Conservation and Natural Resources, that is pending in the Montgomery Circuit Court ("the trial court"). The Oyster Company and the Corneliuses (hereinafter collectively referred to as "the oyster farmers") appeal from the trial court's order dismissing Commissioner Blankenship as a defendant in this action. The trial court certified the dismissal as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. We reverse and remand.
I. Factual Background and Procedural History
The Oyster Company is an Alabama limited liability company authorized to grow, harvest, process, and sell oysters in Mobile County. The Corneliuses are its only members.
Oysters can be farmed either from the bottom of the body of water or in elevated cages. A landowner on waterfront property has a statutory right to plant and to harvest oysters from the bottom in an area 600 yards from the shoreline in front of the property. § 9-12-22, Ala. Code 1975. Tensaw Land & Timber Company, Inc. ("Tensaw"), owns land fronting on Portersville Bay. Tensaw leased its statutory right to grow and to harvest oysters on the bottom in Portersville Bay to the Oyster Company. Tensaw executed two oyster-bottom leases on contiguous tracts to the Oyster Company, conveying oystering rights on the submerged land. The Alabama Department of Conservation and Natural Resources ("the Department") grants shellfish aquaculture easements on state-owned submerged lands for the purpose of cultivating and harvesting shellfish, including oysters. On November 20, 2014, the Department conveyed to the Corneliuses a shellfish aquaculture easement allowing them to raise oysters in cages above the area encompassed by one of the Tensaw leases. Subject to exceptions not here relevant, the riparian landowner does not have the right to harvest oysters in elevated cages within 600 yards from the shoreline in front of the waterfront property; the shellfish aquaculture easement enables the oyster farmers to grow oysters in elevated cages in the area of the easement. The oysters grown elsewhere on the Tensaw leases are grown on the bottom.
While both of the Tensaw leases and the shellfish aquaculture easement were in effect, 4H Construction Corporation contracted with the Department to construct a breakwater and marsh for coastal protection in Mobile Bay ("the Marsh Island project").[2] Construction on the Marsh Island project began in approximately May 2016. It is undisputed that the Marsh Island project was for the public benefit. Sediment and silt removed and released during the construction of the Marsh Island project has been deposited, and is still being deposited, on oyster beds located in the easement and areas of the leases. According to the allegations of the complaint, the sediment and silt deposits have increased over time and are killing the oysters being farmed on those oyster beds.
On September 19, 2016, the Oyster Company sued then commissioner of the Department, N. Gunter Guy, Jr., and 4H Construction in the Mobile Circuit Court, alleging negligence, wantonness, and nuisance against 4H Construction and two *127 claims of inverse condemnation against Commissioner Guy relating to the easement. On October 28, 2016, Commissioner Guy filed a motion to dismiss the two counts against him on the basis that Mobile County was an improper venue for a case involving a State official and for failure to state a claim upon which relief could be granted. The Oyster Company and Commissioner Guy subsequently filed a joint motion to transfer the case to Montgomery County. The Mobile Circuit Court granted the motion to transfer but did not rule on the motion to dismiss.
The Oyster Company then filed an amended complaint in the trial court restating the claims against Commissioner Guy; on December 12, 2016, Commissioner Guy again moved to dismiss the counts against him on the ground that they failed to state a claim upon which relief could be granted. The trial court entered an order on June 2, 2017, dismissing the first amended complaint as to Commissioner Guy. In the meantime, on March 8, 2017, the Oyster Company had filed a second amended complaint to add the Corneliuses, owners of the shellfish aquaculture easement, as plaintiffs. On June 8, 2017, the oyster farmers filed a motion to reconsider the June 2 judgment of dismissal. Then, on June 27, 2017, Commissioner Blankenship[3] filed a motion to dismiss the counts asserted against him in the second amended complaint for failure to state a claim upon which relief could be granted. The trial court entered a judgment on June 28, 2017, dismissing the counts against Commissioner Blankenship in the second amended complaint. On July 28, 2017, the oyster farmers filed a motion to reconsider the June 28 judgment of dismissal. Both motions to reconsider were denied on August 31, 2017.
The oyster farmers explain their allegations in detail in their complaint. The following is taken from their second amended complaint:
"6. As part of the Department's duties for the preservation of lands, the Commissioner initiated the 'Marsh Island (Portersville Bay) Restoration Project' (hereinafter, the 'Marsh Island Project'), which involves the creation of a salt marsh along Marsh Island, a state-owned island in the Portersville Bay portion of the Mississippi Sound, Alabama. The project will restore approximately 50 acres of salt marsh through the placement of sediments and the creation of a permeable segmented breakwater to protect the Marsh Island shoreline. The restored marsh will compensate for salt-marsh habitat lost due to the Deepwater Horizon Oil Spill.
"7. The Department also manages and regulates Alabama's burgeoning shellfish industry. As part of this responsibility, the Lands Division of the Department grants shellfish aquaculture easements on state-owned submerged lands for the cultivation and harvesting of oysters, clams, or mussels and scallops.
"8. Plaintiffs are oyster farmers. [The oyster farmers] raise oysters in Portersville Bay, Mobile County, Alabama.
"9. Ala. Code 1975 § 9-12-22 provides that the beds and bottoms of various bodies of water, including bays, are the property of the State of Alabama, 'but the owners of land fronting on such waters where oysters may be grown shall have the right to plant and gather same in the waters in front of their land *128 to the distance of 600 yards from the shore.'
"10. [Tensaw] is an owner of land fronting on the waters of Portersville Bay. Tensaw leased its § 9-12-22 right to plant and gather oysters to [the Oyster Company] via two oyster bottom leases covering contiguous tracts. The first lease, dated 19 June 2015, has a term of 8 July 2015 to 7 July 2018.... The second lease, dated 29 July 2015, has a term of 1 August 2015 to 31 July 2020....
"11. [The Oyster Company] grows oysters on the bottom of Portersville Bay under the 29 July 2015 lease.
"12. On November 20, 2014, the Department conveyed to the Corneliuses a shellfish aquaculture easement for submerged land encompassed by the 19 June 2015 lease.... The easement allows shellfish aquaculture activities on the submerged bottom and the overlying water column. In the area covered by the easement, [the oyster farmers] grow oysters on the bottom and in elevated cages. In the remainder of the area covered by the 19 June 2015 lease, oysters are grown on the bottom.
"13. 4H Construction contracted with the Department to construct a breakwater and marsh for coastal protection in Mobile Bay. This is the Marsh Island Project, State Project # 2-L198. Among other things, 4H Construction operates heavy machinery to remove underwater sediment south of [the oyster farmers'] leases and easement.
"14. 4H Construction and the Department executed a contract for the Marsh Island Project in or about January 2016. As part of the contract for the construction of the breakwater and marsh, 4H Construction must follow certain requirements such as the prevention of sediment release, creating proper containment berms to prevent the movement of any sediment, and ensure that turbidity levels not exceed certain levels within 200 feet of the project.
"15. In or around May 2016, as construction began, sediment and silt removed and released during the construction began to be deposited on [the oyster farmers'] leases and easement. As time passed and the construction continued, the result was an increase in sediment and silt removed and released from the construction site. The currents caused an increased amount of silt and sediment to be deposited on [the oyster farmers'] leases and easement. The Commissioner and 4H Construction made no efforts, before or after construction began, to determine the amount, extent, duration, or migration direction of the sediment and silt created by the Marsh Island Project.
"16. [The oyster farmers] began noticing a significant drop in their young oyster yield as a result of the silt and sediment created by the project. Before the Marsh Island Project began, [the oyster farmers] had a normal oyster mortality rate of 3 to 5%. Since construction began, the mortality rate has risen to 40 to 50% for oysters in elevated cages. The mortality rate for oysters on the bottom is even higher, in some locations 100%.
"17. As a direct result of the silt and sediment deposited on [the oyster farmers'] oyster beds and cages, [the oyster farmers'] oyster spat and larvae have become contaminated and have been dying at a significantly higher rate than normal. Excessive sedimentation smothers the organisms and increases population mortality. Spat and larvae are significantly affected by sediment load in that they are more sensitive to suspended sediments than adult oysters. On or *129 around May 31, 2016, the contamination was discovered to have negatively impacted [the oyster farmers'] entire oyster population.
"18. During the bidding phase of the Marsh Island Project, the Department and 4H Construction were aware that the creation of the breakwater and marsh would or could cause significant excess silt and sediment to be released into the waters where [the oyster farmers'] oyster beds and cages are located and deposited on [the oyster farmers'] leases and easement. The Department and 4H Construction, as the parties to the contract for State Project # 2-L198, had a duty to use reasonable care to ensure that [the oyster farmers'] neighboring oyster beds and cages were protected from contamination.
"19. The Department and 4H Construction, as the parties to the contract for State Project # 2-L198, had a duty not to unreasonably interfere with [the oyster farmers'] use of their leases and easement.
"20. The silt and sediment deposited on, and which continues to be deposited on, [the oyster farmers'] leases and easement is a permanent condition, inasmuch as the sediment and silt will remain where it is unless physically removed, which may not be possible."
On August 14, 2017, the oyster farmers filed a third amended complaint formally substituting Commissioner Blankenship for Commissioner Guy and adding Greystone Industries, a subcontractor of 4H Construction, as a defendant. The third amended complaint alleged claims of negligence, wantonness, and nuisance against 4H Construction and Greystone Industries (hereinafter collectively referred to as "the State contractors") and asserted the same two claims of inverse condemnation against Commissioner Blankenship as had been asserted in the three earlier complaints. After a hearing, the trial court entered a judgment on August 31, 2017, consolidating the motions for reconsideration filed by the oyster farmers and denying those motions on the basis that the oyster farmers had not alleged a valid inverse-condemnation claim and that, therefore, Commissioner Blankenship was entitled to immunity in his official capacity. After the trial court made its judgment final pursuant to Rule 54(b), Ala. R. Civ. P., the oyster farmers appealed.
II. Standard of Review
We review de novo the trial court's dismissal of Commissioner Blankenship as a defendant.
"On appeal, a dismissal is not entitled to a presumption of correctness. Jones v. Lee County Commission, 394 So.2d 928, 930 (Ala. 1981) ; Allen v. Johnny Baker Hauling, Inc., 545 So.2d 771, 772 (Ala. Civ. App. 1989). The appropriate standard of review under Rule 12(b)(6)[, Ala. R. Civ. P.,] is whether, when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle her to relief. Raley v. Citibanc of Alabama/Andalusia, 474 So.2d 640, 641 (Ala. 1985) ; Hill v. Falletta, 589 So.2d 746 (Ala. Civ. App. 1991). In making this determination, this Court does not consider whether the plaintiff will ultimately prevail, but only whether she may possibly prevail. Fontenot v. Bramlett, 470 So.2d 669, 671 (Ala. 1985) ; Rice v. United Ins. Co. of America, 465 So.2d 1100, 1101 (Ala. 1984). We note that a Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. Garrett v. Hadden, 495 So.2d 616, 617 (Ala. 1986) ;
*130 Hill v. Kraft, Inc., 496 So.2d 768, 769 (Ala. 1986)."
Nance v. Matthews, 622 So.2d 297, 299 (Ala. 1993).
III. Analysis
A riparian landowner has no title to the submerged lands that abut the owner's land to the water's edge. Nevertheless, as previously noted, subject to exceptions not here relevant, the riparian landowner has the right to harvest oysters to the distance of 600 yards from the shore pursuant to § 9-12-22 but does not have a right to harvest oysters using cages above the submerged surface. Such activity is permissible only when the State grants a shellfish aquaculture easement for that purpose. The Oyster Company has leased the riparian right to harvest from Tensaw, the owner of the land at the water's edge, by executing two leases. In one of the two leased areas the oyster farmers use cages above the submerged surface. For this activity, the Department conveyed a shellfish aquaculture easement to the Corneliuses.
According to the complaint, sediment and silt from the activities of the State contractors has interfered with the activities of the oyster farmers under their leases with Tensaw, the riparian landowner, for harvesting oysters on the bottom of the bay. That sediment and silt has also interfered with the oyster farmers' harvesting of caged oysters pursuant to rights conferred by the shellfish aquaculture easement. Based on the State contractors' activities, the oyster farmers claim money damages. The trial court dismissed the counts against Commissioner Blankenship in their complaint based on Commissioner Blankenship's motion to dismiss pursuant to Rule 12(b)(6), Ala. R. Civ. P., for failure to state a claim upon which relief could be granted.
We first address Commissioner Blankenship's contention that the following paragraph in the shellfish aquaculture easement precludes any remedy by inverse condemnation.
"11. PROPERTY RIGHTS: The Grantee shall make no claim of title or interest to the Easement Premises hereinbefore described by reason of the occupancy or use thereof, and all title and interest to said land hereinbefore described is vested in the Grantor. The Grantee is prohibited from including, or making any claim that purports to include, said lands described as the Easement Premises into any form of private ownership. The Grantee is further prohibited from making any claim, including any advertisement, that said land, or the use thereof, may be purchased, sold or re-sold."
Initially, we note that Commissioner Blankenship did not assert this defense in the trial court but introduced it for the first time in his appellate brief. The oyster farmers rebutted this contention by arguing that Commissioner Blankenship's reading of the paragraph leads to an absurd result--undercutting entirely the rights conferred in the instrument. We agree.
The first sentence of paragraph 11 denies to the oyster farmers a claim of "title or interest" to the easement premises "by reason of the occupancy or use thereof." In this proceeding, the oyster farmers' claims are not based merely on their occupancy or use of the easement premises but are derived from the grant in the shellfish aquaculture easement to the Corneliuses of an easement for oyster farming in elevated cages. Moreover, their claims do not assert title or interest in the premises but complain of the disruption of the water quality in the area where their elevated cages are situated. The second sentence *131 deprives the oyster farmers of a claim of private ownership of the lands described as the easement premises. Here again, the oyster farmers' claim that the rights conferred by the easement have been disrupted because of the dispersal of sediment and silt detrimental to oyster farming does not rise to the level of a claim of private ownership of the submerged lands under the elevated cages. The first two sentences are consistent with the general rule that mere presence by permission based on an easement granted by the owner of the fee does not allow the grantee to assert fee simple title by adverse possession to the lands embraced by the easement based on the exercise of rights conferred by the easement. See Blalock v. Conzelman, 751 So.2d 2 (Ala. 1999) ; Harkins & Co. v. Lewis, 535 So.2d 104, 117 (Ala. 1988) ("Ordinary acts of ownership, consistent with permissive possession, are not sufficient to constitute an adverse holding capable of ever ripening into a title."); and Cotton v. May, 293 Ala. 212, 215, 301 So.2d 168, 170 (1974) ("[A] permissive possession does not ripen into title adverse to the owner unless there has been such a repudiation of the permissive possession as to afford notice of an adverse claim."). The last sentence deprives the oyster farmers of any right to claim that the submerged land or the use thereof was available for sale, a scenario irrelevant to this case.
Commissioner Blankenship's contention that paragraph 11 of the easement deprives the oyster farmers of a remedy in inverse condemnation conflicts with the unambiguous language of the paragraph. Acceptance of that contention would rewrite the paragraph and render the rights conferred in the other portions of the shellfish aquaculture easement nugatory. This Court will enforce unambiguous contracts as written. See Ex parte Bill Heard Chevrolet, Inc., 927 So.2d 792, 800 (Ala. 2005) (" '[I]f a contract is unambiguous on its face, there is no room for construction and it must be enforced as written.' Southland Quality Homes, Inc. v. Williams, 781 So.2d 949, 953 (Ala. 2000).").
Commissioner Blankenship's Rule 12(b)(6), Ala. R. Civ. P., argument turns on questions relating to the State's immunity from suit. The general rule as to the immunity that protects the State is stated in Art. I, § 14, Ala. Const. 1901, which provides "[t]hat the State of Alabama shall never be made a defendant in any court of law or equity." A State official sued in his official capacity is also entitled to the protection of State immunity from suit "when the action is, in effect, one against the state." Phillips v. Thomas, 555 So.2d 81, 83 (Ala. 1989). Therefore, if State immunity is applicable to the oyster farmers' claims, Commissioner Blankenship would be entitled to its protection. Lyons v. River Rd. Constr., Inc., 858 So.2d 257, 261 (Ala. 2003). However, an exception from State immunity based on the taking of property for public use is set forth in Art. I, § 23, Ala. Const. 1901, as follows:
"That the exercise of the right of eminent domain shall never be abridged nor so construed as to prevent the legislature from taking the property and franchises of incorporated companies, and subjecting them to public use in the same manner in which the property and franchises of individuals are taken and subjected; but private property shall not be taken for, or applied to public use, unless just compensation be first made therefor; nor shall private property be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner; provided, however, the legislature may by law secure to persons or corporations the right of way over the lands of other persons or corporations, and by general laws *132 provide for and regulate the exercise by persons and corporations of the rights herein reserved; but just compensation shall, in all cases, be first made to the owner; and, provided, that the right of eminent domain shall not be so construed as to allow taxation or forced subscription for the benefit of railroads or any other kind of corporations, other than municipal, or for the benefit of any individual or association."
Inverse condemnation typically involves a taking by a governmental entity without invoking available statutory bases for such taking under which the property owner would have been entitled to just compensation.
"In United States v. Clarke, 445 U.S. 253, 100 S.Ct. 1127, 63 L.Ed. 2d 373 (1980), the United States Supreme Court explained the difference between formal condemnation proceedings and inverse condemnation proceedings. A formal condemnation proceeding is a legal action brought by a condemning authority, such as the Government, in the exercise of its power of eminent domain. 'Inverse condemnation' refers to a legal action against a governmental authority to recover the value of property that has been taken by that governmental authority without exercising its power of eminent domain--it is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when the taking authority has not initiated condemnation proceedings. Condemnation proceedings require affirmative 'taking' action on the part of the condemning authority; the particular action required depends on the particular statute applicable. However, in inverse condemnation actions, a governmental authority need only occupy or injure the property in question; when that occurs and the property owner discovers the encroachment, the property owner has the burden of taking affirmative action to recover just compensation."
Jefferson Cty. v. Southern Natural Gas Co., 621 So.2d 1282, 1287 (Ala. 1993). Here, no statutory procedure exists for the alleged taking by reason of the dissemination of sediment and silt from the activities of the State contractors.
Commissioner Blankenship contends that this absence of a statutory procedure is fatal to the oyster farmers' claims against him, relying on Ex parte Carter, 395 So.2d 65, 67 (Ala. 1980). The oyster farmers requested at oral argument that we overrule Carter, and we thereafter ordered briefs addressed to that issue.[4] In *133 Denson v. Alabama Polytechnic Institute, 220 Ala. 433, 126 So. 133 (1930), this Court recognized the State's inherent power to condemn; hence, an action in inverse condemnation pursuant to rights recognized by § 23, Ala. Const. 1901, did not depend on whether the legislature had adopted procedures for certain types of taking. To the extent that Carter supports the view that the existence of a legislative procedure for taking of the category of property at issue is a prerequisite to an action seeking damages for the alleged inverse condemnation of such property, it is expressly overruled.[5]
Both parties rely on Ex parte Alabama Department of Transportation, 143 So.3d 730 (Ala. 2013) (" ALDOT"), in which this Court recognized an inverse-condemnation claim where the Department of Transportation had flooded private property with contaminated water. The oyster farmers contend that the disbursement of contaminated water onto the property in ALDOT is the equivalent of the deposit of sediment and silt in this proceeding. Commissioner Blankenship contends that ALDOT stands for the necessity of direct involvement by the State because the flooding in ALDOT was not the result of activities by a contractor. We note that ALDOT is a plurality opinion in which only three Justices concurred; it is therefore not dispositive of the issues here presented.
We need not reach the question whether activities of a contractor insulate the State from an inverse-condemnation claim because the complaint alleges that the Department knew that the Marsh Island project would or could carry the excess sediment and silt onto the areas embraced by the leases and the shellfish aquaculture *134 easement when it entered into the contract for the Marsh Island project. We see no material difference between this fact pattern and the affirmative act of pumping the contaminated water present in ALDOT.
Construing the allegations of the complaint in favor of the oyster farmers, as we must (see Hexcel Decatur, Inc. v. Vickers, 908 So.2d 237 (Ala. 2005) ; and Nance v. Matthews, 622 So.2d 297, 299 (Ala. 1993) ), we conclude that the activities of the State contractors foreseeably resulted in interference with the private-property rights acquired by the oyster farmers from the riparian landowner--Tensaw. Moreover, the shellfish aquaculture easement acquired from the State created private-property rights that were disrupted by the sediment and silt and for which a right to damages for a taking is recognized in § 23, Ala. Const. 1901. That the rights interfered with were asserted by a person who does not hold fee-simple title is immaterial. See Drummond Coal Co. v. State, 548 So.2d 430, 432 (Ala. 1989) ; Harco Drug, Inc. v. Notsla, Inc., 382 So.2d 1, 3 (Ala. 1980) (recognizing that leasehold interests are subject to taking by eminent domain and that the taking is compensable). Because leasehold interests can be taken by eminent domain, and therefore by inverse condemnation, it correspondingly follows that easements, another real-property interest allowing the use of a property right held by the owner of the land, can be taken by eminent domain and therefore by inverse condemnation.[6] Accordingly, we hold that the oyster farmers properly stated claims of inverse condemnation upon which relief can be granted. We further hold that because the exception from State immunity based on the taking of property for public use applies here, the defense of State immunity is not available to Commissioner Blankenship as to the oyster farmers' inverse-condemnation claims.
IV. Conclusion
The trial court erred when it dismissed Commissioner Blankenship as a defendant based upon his argument that the oyster farmers failed to state a claim upon which relief could be granted. The order of the trial court doing so is hereby reversed, and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
Pamela Willis Baschab, Terry L. Butts, Gorman Houston, Thomas A. Woodall, and Sharon G. Yates, Special Justices, concur.
Jean Williams Brown, Special Justice, dissents.
JEAN WILLIAMS BROWN, Special Justice (dissenting).
I respectfully dissent. Because the oyster farmers did not raise in the trial court the issue whether Ex parte Carter, 395 So.2d 65 (Ala. 1980), should be overruled, and instead raised this issue in this Court for the first time during oral argument, I do not find that this argument was properly preserved for review by this Court.
I agree with Justice Shaw's dissent in Ex parte Pollard, 160 So.3d 835, 837 (Ala. 2014), wherein he stated:
"Parties should be required to direct the trial court to the correct 'arguments' instead of allowing the focus to dwell on immaterial issues or, intentionally or not, 'sandbagging' the trial court with inconsequential 'arguments,' while leaving *135 the appellate courts to address the true 'questions' never brought to the attention of the lower court."

Canon 3.C of the Canons of Judicial Ethics requires a Justice to disqualify himself or herself in any proceeding in which the Justice's impartiality might reasonably be questioned. On January 11, 2018, the Chief Justice and Associate Justices recused themselves from consideration of this case. Pursuant to § 149, Ala. Const. 1901, the following former Associate Justices and Appellate Judges were appointed to serve as the special Supreme Court in this case: Champ Lyons, Jr., Pamela Willis Baschab, Jean Williams Brown, Terry L. Butts, Gorman Houston, Thomas A. Woodall, and Sharon G. Yates.

The project is situated in the Portersville Bay portion of the Mississippi Sound, Alabama.

At some point during these proceedings Commissioner Blankenship succeeded Commissioner Guy as commissioner of the Department.

The dissenting opinion faults the oyster farmers for failing to request in the trial court that Carter be overruled. The view that a request for such relief in the trial court is a prerequisite to appellate review at one time had some support in this Court. See, e.g., Goodyear Tire & Rubber Co. v. Vinson, 749 So.2d 393, 400 (Ala. 1999) (Lyons, J., concurring specially). More recent authority is inconsistent with that view. See Ex parte Vanderwall, 201 So.3d 525 (Ala. 2015), in which this Court overruled a controlling decision in a setting where the appellant had not asked the trial court or this Court to do so. A special concurrence in Vanderwall cites authorities that demonstrate the absence of an ironclad rule requiring a request to overrule precedent as a prerequisite to such relief. 201 So.3d at 540 (Murdock, J., concurring specially). See also, e.g., Travelers Indem. Co. of Connecticut v. Miller, 86 So.3d 338, 347 (Ala. 2011) ("Although we have not been asked to overrule Haston [v. Transamerica Insurance Services, 662 So.2d 1138 (Ala. 1995) ], and it is this Court's practice not to address issues not presented on appeal, Haston is an aberration; none of this Court's decisions subsequent to Haston have relied on it to provide an injured party an independent right to provide notice to an insurer after a default judgment is entered against the insurer's insured. Accordingly, we overrule Haston ....").
This Court never adopted the rule expressed in the concurring opinion in Vinson, and Commissioner Blankenship has not requested that we overrule Ex parte Vanderwall and the other authorities recognized in the concurring opinion in Vanderwall. It would be difficult to justify recognition of such exalted status for a proposed rule requiring a request to overrule precedent in the trial court as a prerequisite to such relief if we saw fit to do so in a case where the existing precedent clearly does not require such request and Commissioner Blankenship has not asserted, either in the trial court or in this Court, that such precedent should be overruled. The oyster farmers' request at oral argument to overrule Carter, coupled with this Court's subsequent request for supplemental briefs on the issue whether to overrule Carter, comports with existing precedent and satisfies any concerns for due process that might otherwise obtain in the absence of adequate notice to the parties of the Court's consideration of whether to overrule Carter.

We have not ignored the extent to which considerations of stare decisis protect Carter from being overruled. We have not found, nor has Commissioner Blankenship cited, any subsequent case applying this aspect of Carter whereby the availability of a remedy for inverse condemnation depends on the existence of a legislative grant of authority. Moreover, the weight accorded to the doctrine of stare decisis is diminished in cases involving constitutional issues, in acknowledgment of the practicalities involved in correcting an erroneous interpretation of rights afforded by the Constitution by resort to the amendatory or legislative process. See Marsh v. Green, 782 So.2d 223, 232-33 (Ala. 2000) ("However, when the Constitution is misinterpreted, the doctrine of stare decisis is not entitled to the deference it otherwise receives. In Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the United States Supreme Court stated that, while the doctrine of stare decisis counsels against a reconsideration of precedent, the Court has been particularly willing to reconsider constitutional cases because, in such cases, ' " 'correction through legislative action is practically impossible.' " ' Id. at 63, 116 S.Ct. 1114 (quoting Payne v. Tennessee, 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), in turn quoting Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 407, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting) ). See, also, Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 42-43 n. 10 (Ala. 1998) (Lyons, J., concurring specially).").

We do not deal in this case with a taking of the oysters. The absence of a claim for the taking of the oysters does not pretermit the oyster farmers' claims for interference with property rights here presented for the reasons heretofore discussed.